CITY OF LA FOLLETTE et al. v. LA FOLLETTE WATER, LIGHT & TELEPHONE CO.

(Circuit Court of Appeals, Sixth Circuit. June 14, 1918.)

No. 3115.

1. MUNICIPAL CORPORATIONS ⬡═⯈285—POWER TO CONTRACT—GRANT OF FRANCHISE.

A contract by a city for the supplying of water and electric lights for public purposes for 30 years, and fixing prices therefor, made under express legislative authority, with a company to which it granted an exclusive franchise for a like term, *held* valid and enforceable, so far, at least, as it relates to the city's contract, in its proprietary capacity, for a public supply of water and light.

⬡═⯈For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. MUNICIPAL CORPORATIONS ⚖111(4)—ORDINANCES—PARTIAL INVALIDITY.

An ordinance contracting for water and electric lights for public purposes, and incidentally granting to the company furnishing the same an exclusive franchise therefor, which was within the franchise power of the city, and also granting an exclusive franchise to use the streets for supplying water and lights to the inhabitants, which was not within its powers, is divisible, and valid, at least, as to the feature relating to the supplying of water and electric lights for public purposes.

3. SPECIFIC PERFORMANCE ⚖16—DEFENSES—HARDSHIP.

The matter of hardship as a defense to a suit for specific performance is in general to be determined in the light of the circumstances and conditions at the time the contract was made.

4. SPECIFIC PERFORMANCE ⚖94—RIGHT TO RELIEF—SUBSTANTIAL PERFORMANCE BY COMPLAINANT.

Substantial performance of a contract by complainant is in general sufficient to authorize a decree for specific performance.

5. SPECIFIC PERFORMANCE ⚖94—RIGHT TO RELIEF—SUBSTANTIAL PERFORMANCE BY COMPLAINANT.

To entitle a water company to specific performance of a contract with a city to furnish water for public purposes, it must show substantial performance of a further part of the contract to supply water, impliedly of good quality, to the inhabitants for domestic use.

6. SPECIFIC PERFORMANCE ⚖94—RIGHT TO RELIEF—SUBSTANTIAL PERFORMANCE BY COMPLAINANT.

A city, which approved of the source from which a company was to supply water, cannot resist specific performance of a contract for water for fire protection because of minor defects in the water, due to such source, which cannot be removed by use of reasonable appliances and methods.

7. SPECIFIC PERFORMANCE ⚖130—CONTINUING CONTRACT—CONDITIONS TO GRANTING RELIEF.

In decreeing specific performance against a city of a contract for hydrants and street lights, which has a number of years to run, the court may properly, as a condition, require complainant to assent to such modifications as may be just and equitable.

8. SPECIFIC PERFORMANCE ⚖130—CONDITIONS ON GRANTING RELIEF.

Conditions imposed by the decree upon complainant as preliminary to granting specific performance *held* just and equitable.

In Error to the District Court of the United States for the Eastern District of Tennessee; Edward T. Sanford, Judge.

Suit in equity by the La Follette Water, Light & Telephone Company against the City of La Follette and others. Decree for complainant, and defendants bring error. Affirmed.

The city of La Follette, by ordinance contract of June 6, 1905, in terms granted appellee an exclusive franchise for 30 years for constructing and maintaining a system for supplying water, electric light, and telephone service to the city and its inhabitants and vicinity. The ordinance contained provisions fixing rates to consumers generally for each of the three classes of service, and with express provision for furnishing the city, during the entire term of 30 years, with 40 hydrants for fire purposes at $40 each per year, and for public lighting with 50 arc lamps at $75 each per year, and for an annual tax levy of nine-tenths of 1 per cent. on the taxable property in the city during the entire contract period, for meeting the payments for such fire hydrants and public lights. The city was incorporated by chapter 161 of the Acts of the Tennessee Assembly of 1897, section 9 of which authorized the city to contract and provide for the lighting of streets, public buildings, and other public places; to contract and provide for water within and beyond

the city limits for all public and corporation purposes; to provide for the prevention or extinguishment of fires; and, in apparent effect, generally to make other provisions for the protection of the health and comfort of the inhabitants of the city. By section 14 of that act the La Follette Land & Improvement Company (whose rights were later assigned to appellee) was given an exclusive 30-year franchise for supplying the city and its inhabitants with water, electric light, and certain other service; by section 15 all corporate franchises were limited to 30 years or less, and the city was authorized, in its discretion, to make contracts for a public supply of gas, water, and electric lights for the full period of any franchise granted by the act or by the council of the city. The original franchise ordinance of 1905 called for a water supply from wells; the system was later changed to dam and reservoir; and by ordinance in 1907, in consideration of the additional expense of the change, the annual price of the fire hydrants was increased to $50, the number being decreased to 32—the total rental being unchanged. An amendment to the city charter, in 1911 (Laws 1911, c. 655), limited the aggregate tax levy for any one year to 2 per cent. of the assessment, with the proviso that "in making such levy full compliance with existing contracts and ordinances for the maintenance of public electric street lighting and fire protection by maintaining a water hydrant system shall be observed, nor shall any existing obligations of the city * * * be impaired." By section 14 of the amendatory act the future renewal, granting or extension of franchises for occupying or using the city streets, etc., was forbidden except on petition signed by a given percentage of the legal voters and on approval of the ordinance by the electors, with provision that "nothing in this act shall affect or annul any franchises heretofore granted within said city." The water system was completed to the satisfaction of the city by December 31, 1907, and the entire electric light, telephone, and water systems were accepted by the city on December 31, 1907, as in compliance with the franchise. Appellee put out a bond issue of $150,000, secured by mortgage on its plant.

From December 31, 1907, the contract payments for hydrants and lights were duly met by the city until January 25, 1915, when the city officials notified appellee, in writing, that it regarded the franchise contract as "void, for reasons which are not necessary to be here stated," and refused payment "upon any charge hereafter made" unless upon the making of a new and suggested arrangement, by which the number of hydrants and lights should be reduced, the location of some of them changed, and half lights substituted for some of the full lights. These changes would greatly reduce the rental.

Thereupon appellee, treating the notice as an attempt to revoke or repudiate the franchise, filed its bill for specific performance of its contract, including the levying of the tax provided for meeting rentals, and the administering of an asserted trust in the taxes already collected for that purpose and on hand.

Defendant's answer asserted the invalidity of section 14 of the city charter of 1897, as well as of the original franchise ordinance of 1905 (including its taxation provisions), and of the 1907 amendment to the ordinance, and denied that the charter amendment of 1911 had the effect to impose on the city any duty with respect to the levy and collection of the taxes mentioned or their application to the payment of rentals. In denial of the asserted right to specific performance the answer alleged that the water plant was inadequate to supply fully the demands made on it; that it had not been operated conformably to the contract; that the water furnished thereby to the city and its inhabitants, especially during the late summer and fall seasons, is contaminated with impurities and liable at any time to become impregnated with disease germs; that appellee has failed to install a public horse drinking fountain as required by its contract; that the lights provided furnished but three-quarters of the contract power; that the contract itself is unconscionable; that in its municipal acts with reference to the contract the city had been dominated by the personal interests of La Follette and his associates; and that the contract itself had been obtained by "sinister influences"; that many of the existing hydrants were useless and others located where there was little or no need for them; that many of the lights were of no service and the rentals therefor excessive; that the city is unable to raise enough to pay the rental for the water and the lights and observe its municipal requirements gener-

ally. It offered to make payment for lights and hydrants during the pendency of suit according to the proposal for modified contract before referred to.

After hearing upon proofs taken in open court, Judge Sanford filed an opinion holding the ordinance-contract valid and enforceable, at least so far as it relates to the public supply of water and light for purely municipal purposes, and holding appellee entitled to specific performance in respect to those features upon complying with certain conditions. The opinion of Judge Sanford follows:

"After careful consideration of the evidence and arguments of counsel, my conclusions are:

[1] "1. Secs. 9 and 15 of the Act incorporating the City of La Follette (Tenn. Acts of 1897, c. 161, p. 351), unquestionably authorized the City to enter into contracts for the public supply of water and electric lights for the period of thirty years.

"2. Under this legislative authority the City could, in my opinion, lawfully enter into a contract for the furnishing of City water and electric lights for such period, and provide therein for the number and character of hydrants and electric lights to be maintained, and the prices to be paid therefor during such period. Obviously, unless authorized to so contract, it would be, as a matter of business, practically impossible to obtain a party willing to make the necessary investment in a plant adequate to enable such water and lights to be furnished. Sec. 15 of the charter specifically provided that 'the city council may, at its own discretion, enter into contracts for the public supply of gas, water and electric lights for the full period of any franchise granted, by this ACT or by said council,' that is, for a period of thirty years. The right to enter into such contract necessarily embraced, as I view it, the right to agree as to its essential terms, including both the number and character of the public facilities to be furnished, and the price to be paid therefore during the contract period. The case of Freeport Water Co. v. Freeport City, 180 U. S. 587, 21 Sup. Ct. 493, 45 L. Ed. 679 (in which four justices, including the present chief justice, dissented), relied on by the defendants, is not, as I view it, a conclusive adjudication to the contrary. That case involved a statute materially different from that now under consideration, which was held capable of being reasonably construed *distributively*, so that the statutory period related only to the maintenance of the water works and not to the rates to be paid, and was, as it appears, largely determined on the ground that the Supreme Court of Illinois had so construed it, and that hence, under the doctrine of Burgess v. Seligman, 107 U. S. 20, 33, 2 Sup. Ct. 10, 27 L. Ed. 359, this construction was to be followed by the Federal Courts, if the true construction of the statute was a matter 'balanced with doubt' (180 U. S. pages 595 and 597, 21 Sup. Ct. 493, 45 L. Ed. 679). In the instant case, however, the charter has not been construed by the Supreme Court of Tennessee; and it is the duty of this court to give effect to its own construction of the charter, which appears to me to be entirely plain.

"3. The right given the City by Sec. 15 of the charter to enter into a contract, in its proprietary capacity, for the public supply of water and electric lights for thirty years, necessarily authorized it to give, as an incident of such contract, an exclusive franchise in the streets of the city for the purpose of furnishing the public service contracted for. See, by direct analogy, Walla Walla v. Water Co., 172 U. S. 1, 17, 19 Sup. Ct. 77, 43 L. Ed. 341; Vicksburg v. Water Co., 202 U. S. 453, 26 Sup. Ct. 660, 50 L. Ed. 1102, 6 Ann. Cas. 253; and Vicksburg v. Water Co., 206 U. S. 496, 27 Sup. Ct. 762, 51 L. Ed. 1155.

"4. It did not, however, either expressly or by necessary implication, give the city the right to give, by ordinance, in its legislative capacity, an exclusive franchise in the streets of the City during such period, for the purpose of supplying water and lights to the inhabitants of the city for private purposes. Water Co. v. Hutchinson, 207 U. S. 385, 28 Sup. Ct. 135, 52 L. Ed. 257. And see Detroit Street Railroad v. Detroit Railroad, 171 U. S. 48, 55, 18 Sup. Ct. 732, 43 L. Ed. 67, and Nelson v. Murfreesboro (C. C. Tenn.) 179 Fed. 905.

"5. Nor was such exclusive franchise for private purposes legally conferred by Sec. 14 of the City charter (p. 365) purporting to give the La Follette Land & Improvement Co., the plaintiff's assignor, such exclusive

franchise for thirty years after the acceptance of the City Charter. This section of the City Charter is in my opinion, void for the following reasons, if not otherwise: (a) Such provision is not expressed in the title of the Act, and hence violates Sec. 17 of Art. 2 of the Constitution of Tennessee; and (b) it seeks to enlarge the corporate powers of the La Follette Light & Telephone Co., a private corporation, by special legislation, and hence violates Section 8 of Art. 11 of said Constitution.

[2] "6. I do not think, however, that the ordinance contract of June 6, 1905, was rendered void in its entirety by reason of the fact that in addition to lawfully contracting for a supply of City water and lights for thirty years, it also sought, without authority, to give the plaintiff an exclusive franchise for thirty years for supplying water, lights, etc., to the inhabitants of the city. The franchise for supplying facilities to the inhabitants for private use related to an entirely separate and distinct matter from that of supplying facilities to the City for public use, and the fact that it was sought, without authority, to make the franchise for supplying the inhabitants exclusive, does not render the other separable features of the contract void, especially those in reference to the supplying of facilities for public use, but merely has the effect of rendering invalid the exclusive feature of the franchise sought to be given for the purpose of supplying the inhabitants. In this respect the instant case differs, as I view it, from Manhattan Trust Co. v. Dayton (6th Circ.) 59 Fed. 327, 8 C. C. A. 140, and other cases relied on by defendants, in which it was held that under statutes authorizing a municipality to enter into a contract with public service corporations 'not exceeding' a certain term of years, a contract entered into for a single term of greater length was, in effect, prohibited by the statute, and, being single and indivisible, could not be changed by the court, either by inserting a term of limitation where none existed, or substituting one term for another, so as to render it a lawful contract for any period, the contract itself not being so worded as to enable the court to separate the lawful from the unlawful. If, however, the contracts in these cases had provided for two separate periods, one within the lawful power of the municipality and one for an additional period beyond such power, it seems clear that the courts would have separated the lawful from the unlawful provisions and held the former to be valid. And in the instant case, I am of opinion that the contract ordinance is clearly divisible; that the provisions as to public and private service are not bound up indivisibly in a single provision, and that the court may and should separate the lawful from the unlawful, and while holding that the contract was invalid insofar as it sought to give an exclusive franchise in the streets of the city for thirty years for the purpose of supplying inhabitants of the City with water, etc., that it was nevertheless valid otherwise, and especially insofar as it contracted for the supply of water and light for the City itself during such period and gave an exclusive franchise for such purpose. The distinction, in short, is this: In the Dayton and other cases, the contract was single and indivisible, and for a term, which, as construed by the court, was prohibited by the statute, thereby rendering the contract void in its entirety. In the instant case, the contract relates to two distinct subject matters; one a contract entered into by the City in its proprietary capacity in relation to its own public service; the other a contract entered into by it in its legislative capacity in reference to the supplying of water to its citizens. These provisions, entered into by the City in different capacities, are clearly separate and divisible. Neither of them is *forbidden* by statute. The one entered into by it in its proprietary capacity is, in my opinion, clearly authorized by the charter; while the other, entered into in its legislative capacity, although not authorized, insofar at least as its exclusive feature is concerned, is neither expressly nor impliedly forbidden. I am hence of opinion that there is nothing in the doctrine of the cases relied on by the defendants which should prevent the court in the administration of justice from separating this contract into its component parts, and from holding that part which relates to the furnishing of public facilities and the exclusive franchise therefor to be valid, unaffected by the invalidity of the provision relating to the exclusive franchise sought to be given for supplying facilities to the inhabitants of the city.

"This conclusion is in accordance with the statement in Patton v. Chattanooga, 108 Tenn. 197, 229, 65 S. W. 414, and cases therein cited, that where a city authorized to grant a franchise, seeks, without authority, to make such franchise 'exclusive,' this could 'only make the exclusive features invalid,' and that the 'franchise might still be valid, though not exclusive.' And it was furthermore said in that case that the purported exclusive feature of the franchise could only be questioned by someone claiming the right to do something contrary to the exclusive feature (108 Tenn. at page 230, 65 S. W. 414), that is, under another and conflicting franchise granted by the City.

"Furthermore, in Morristown v. Telephone Co. (6th Circ.), 115 Fed. 304, 308, 53 C. C. A. 132, in which Circuit Judges Lurton and Day both sat, the court, speaking through Judge Lurton, who had previously delivered the opinion in the Dayton case, upon which the defendants chiefly rely, said: 'An ordinance conferring street easements in excess of the power of the municipality to grant is not necessarily void. For example, ordinances conferring exclusive rights by a municipality having no power to grant exclusive rights have been held valid so far as to convey a right, subject to the right of the city to grant like privileges in same streets to others. Levis v. City of Newton (C. C.) 75 Fed. 884; City of Waterloo v. Waterloo St. Ry. Co., 71 Iowa, 193, 32 N. W. 329. The same rule would apply to an ordinance valid in part and invalid in part which is applicable to a statute. If the grants are so distinctly separable that each can stand alone, and the court is able to see that there is no such interdependence as to make the validity of a part depend upon the validity of every part, the ordinance will be upheld so far as valid.' To the same effect are: Kimball v. Cedar Rapids (C. C.) 100 Fed. 802, 803 (Shiras, J.); Bellevue Water Co. v. Bellevue, 3 Idaho, 739, 753, 35 Pac. 693; Gadsden v. Mitchell, 145 Ala. 137, 40 South. 557, 6 L. R. A. (N. S.) 781, 117 Am. St. Rep. 20; and Clarksburgh Light Co. v. Clarksburg, 47 W. Va. 739, 749, 35 S. E. 994, 50 L. R. A. 142. These authorities are conclusive of the present question, and necessarily result in the holding that the invalid 'exclusive' feature of the franchise sought to be granted the plaintiff for supplying facilities to the inhabitants does not render the contract invalid otherwise.

"As the plaintiff's bill does not allege any denial by the defendants of the right to enforce so much of the ordinance as relates to the supplying of facilities to the inhabitants of the city, and when properly construed seeks only to enforce so much of the ordinance as relates to the contract with the City for the supply of public water and lights, and no other relief can in any event be predicated, I find it unnecessary to determine whether so much of the ordinance as relates to the furnishing of facilities to the inhabitants is otherwise irrevocable and binding upon the City, especially in reference to so much of the ordinance as purported to fix the rates to be charged the inhabitants for such service, being of the opinion that whatever may be the effect of such provision in the ordinance, it can not, for reasons analogous to those already stated in reference to its exclusive feature, render invalid the separable part of the contract relating to the furnishing of lights and water to the City itself.

"8. I do not find under the evidence that this contract ordinance was fraudulently procured or was not in fact the lawful act of the City Council. While apparently some of the members of the City Council may have been largely influenced by the relationship which they bore to the La Follette Coal, Iron & Railway Co., I do not find any satisfactory evidence of undue influence exercised in that regard. Furthermore, while the contract appears to have been agreed upon between the plaintiff and representatives of the La Follette Coal Company before it was submitted to the city council and to have been passed without any especial discussion (although not secretly), I find that the La Follette Coal Company had a much larger proportionate interest as a taxpayer in the City than it did as a prospective stockholder in the plaintiff, and that it was hence in a position to desire only a just and equitable contract, since if inequitable provisions were imposed upon the City, it would, as a taxpayer, have to pay out a larger sum of money than it would receive back in dividends on its stock in the plaintiff, and that it did in fact negotiate what appeared to be a fair and just contract, for twenty years shorter period than the plaintiff desired and with provisions looking to reduction in rates in the event of the

growth of the city in proportion. In fact the ordinance adopted appeared to have met with the entire approval of the citizens generally and to have been discussed and approved in a public meeting of the Board of Commerce. Some provision for waterworks system was imperatively needed in view of the recent conflagration which had so seriously injured the city, and the absence of protection from fire which had greatly raised the insurance rates and rendered them very high if not prohibitive. I find no evidence that as conditions then existed the City could have reasonably expected to make a contract with anyone else upon substantially better terms than those embodied in this ordinance, or that there was either bad faith or lack of public necessity, as it then appeared, in the provision of the ordinance, either as originally passed or subsequently amended in reference to the extent of facilities to be supplied; nor evidence that the rates fixed for such service, either in the original or amended ordinance, upon the faith of which the plaintiff extended its mains, etc., were unreasonably high.

[3] " 'The matter of hardship as a defense to a suit for specific performance is, in general, to be determined in the light of the circumstances and conditions at the time the contract was made, and not on that of a subsequent change in circumstances.' Franklin Telegraph Co. v. Harrison, 145 U. S. 459, 472, 473, 12 Sup. Ct. 900, 36 L. Ed. 776; Lee v. Kirby, 104 Mass. 420, 428; Southern R'y v. Franklin R. R., 96 Va. 693, 709, 32 S. E. 485, 44 L. R. A. 297.

"Nor does the evidence show that the rates charged the City are even now unreasonably burdensome, or substantially higher than the rates charged for similar services generally; especially in the light of the fact that the net earnings of the plaintiff, over and above operating expenses, appear from the beginning to have been no more than sufficient to enable it to pay the five per cent. interest on its $150,000 of bonded indebtedness, representing an actual cash investment of about $110,000; that is, a little over seven per cent. on the actual investment, with no payment of dividends to stockholders and no setting aside of any sinking fund to discharge the bonds on their maturity, and leaving it largely indebted even for its president's salary.

"The provision in the contract for a public (horse) fountain I furthermore find to have been informally released, for what was supposed to be a valuable consideration, by a subsequent council, and as no request for its installation is shown to have been made by the present or any other subsequent council, this is clearly not a ground for denying specific performance.

[4, 5] "9. The question as to whether the plaintiff has substantially performed the contract on its part so as to now entitle it to a decree for specific performance presents greater difficulty. Substantial performance of a contract is, in general, sufficient to authorize a decree for specific performance, literal and exact performance not being required. Secombe v. Steele, 20 How. 94, 104, 15 L. Ed. 833; 36 Cyc. 697. On the hearing the plaintiff excepted to the evidence bearing upon the potability or quality of the water furnished to domestic consumers, which was tentatively overruled, and at the conclusion of the first hearing moved to exclude all this testimony on the grounds, in substance, that it was not material to the questions involved in this suit relating to the water furnished the City for fire hydrants, and that there is no representation in the ordinance as to the character of the water to be furnished. I am of opinion, after careful consideration, that this evidence was properly admitted, and that the motion to exclude should be overruled. Under the contract, the plaintiff agreed (Sec. 2) to establish a water works system 'necessary to provide a complete outfit for the supply of water for domestic, commercial and fire purposes,' of such design and capacity as necessary to enable it to fully supply the demand for service at the time of completion of the original system, with extensions from time to time as there should be a reasonable demand for increased service, with certain provisos as to extensions of service not necessary to be now referred to. It was, I think, necessarily implied as a term of this contract that the water supply for domestic purposes should be reasonably adapted in quality to domestic use. See as to high police duty resting upon a municipality in this respect in respect to furnishing pure and wholesome water, Columbus v. Mercantile Trust Co., 218 U. S. 645, 659, 31 Sup. Ct. 105, 54 L. Ed. 1193. Furthermore, as the City in this ordinance

contract acted not only in its proprietary capacity for public service, but also in its legislative capacity for service to its inhabitants, it can not be assumed, I think, that it would have made the contract which it did in reference to public service or agree to pay the prices which it did for such service independently of the contemplated benefits to be received by the inhabitants in private service to be furnished under the contract, and I am of opinion that a substantial performance of that portion of the contract relating to private service to consumers, with its implied terms, is essential in order to entitle the plaintiff to a decree against the City for specific performance of that portion of the contract relating to the public service, as well as substantial performance of those provisions of the contract relating to the public service. See, by analogy, Winfield v. Water Co., 51 Kan. 70, 32 Pac. 663.

"In reference to the performance by the plaintiff of its contract, I find the following facts to be established by the greater weight of the evidence:

"The plaintiff built its water and electric light system to the satisfaction of the city council, and the same were accepted by the council as in full compliance with the contract. The water works system was supplied by reservoir which was located about a mile from the City and was constructed by damming up a creek on the water shed, which contained some thirteen square miles or about 8,500 acres, part of which was flooded by the dam. There were at that time various people living on this water shed, some of them near the tributaries of this creek, but mostly at some distance from the dam. The greater part of this water shed was neither owned nor controlled by the plaintiff. This water shed had been used to a considerable extent for stock grazing. These facts were known to the city council. After the dam was constructed, various people continued to live upon the water shed and cattle and hogs to be grazed or herded thereon. At different times certain sawmills were also located within this water shed and logging camps established; and at one time a considerable number of people lived on the water shed. At the time the proof was taken in this case, however, the number of people living thereon had been reduced to forty-four. There was no filter in the reservoir, and at the beginning the plaintiff depended for purification of the water merely upon the settling process, due to the length of time which the water stood before it was used, and which was effectual in removing a considerable portion of the impurities. During the dry seasons of the year, however, the supply of water was considerably diminished and there were at time a potential failure of a full supply; which, however, never became actual in such sense as to deprive either the City or its inhabitants of the use of the water. There was also some trouble with the water due to algae, a microscopic vegetable growth, which did not, however, affect its healthful properties, but gave it an unpleasant odor at times; these algae first appearing in 1911, and being a common water trouble in many other places. The plaintiff took advice from United States authorities in reference to this matter, but as the trouble re-appeared in 1912, employed an engineer, who recommended heightening the dam. The plaintiff thereupon, at its own expense, heightened the dam six and a half feet, increasing its capacity from seven million five hundred thousand gallons to at least twenty-five million gallons, the additional time which the water stands in the reservoir before being used being now about thirty days, thereby materially increasing its purification by settling; this being a common method of purifying water derived from surface supplies. Since the raising of the dam it has contained a full and sufficient supply of water for all purposes, public and domestic. During all this time the water was used both by the City and its inhabitants, both in the fire hydrants and for domestic use. A majority of the citizens who took water service appear to have used this water all the time for drinking as well as bathing and other household purposes; although some, especially before the height of the dam was increased, seem to have usually stored the water in cisterns during the flood seasons and in the dry seasons drunk the water from the cisterns. The great weight of the testimony, especially that of physicians resident in La Follette, indicates that no diseases, either typhoid or otherwise, could at any time be traced to the use of this water, the weight of the evidence indicating that such typhoid as has existed

252 F.—49

is more directly traceable to the use of springs, which were still resorted to by people who did not take the plaintiff's water.

"Even since the dam was raised there appears to have been some trouble in the use of hydrants due to the collection of muddy sediment where hydrants had been standing unopened for some time. It does not appear that the Water Company ever opened the hydrants to permit this muddy sediment to escape. However, the proof does not satisfactorily establish that the City ever made any complaint in this regard; or asked permission to open the hydrants for this purpose, or that the same was ever refused. At one fire some two or three years ago, in which a church was burned, there appears to have been some trouble in getting a full flow of water due to this muddy sediment, although the lack of sufficient flow was apparently contributed to, if not entirely caused, by failure to turn on the hydrant to its full extent.

"In the year 1914 the plaintiff, apparently of its own volition, commenced making bacteriological tests of the water for the purpose of improving its character. These analyses indicated that while the water was, in the main, of good character, there were some specimens which indicated possible sources of danger, as indicated by the percentage of colon bacilli. The percentage of colon bacilli, however, does not, in my opinion, under all the evidence, necessarily indicate dangerous impurity in the water the safety of the water depending not upon the colon bacilli, which in themselves are not harmful, being merely intestinal germs and not disease germs, but upon the presence or absence of the typhoid germ, which under the weight of modern scientific opinion, comes from contamination by discharge from a human being having typhoid fever. Vital statistics indicate, however, that with the small number of people now living on this water shed, there is only a probability of one case of typhoid fever in the whole water shed every ten years. When there is added to this the uncertainty as to whether the typhoid germs from such patient would reach the water source, the possibility of typhoid infection of the water supply through the persons living on the water shed is, in my judgment, very remote.

"Since these bacteriological analyses were made, however, the plaintiff, after first resorting to a system of purification by alum, has employed Professor Switzer, hydraulic engineer at the University of Tennessee, and an expert in these matters, and under his direction has established additional method of purifying the water supply supplementing the settling process, namely, an improved treatment by a solution of alum and soda ash, producing an artificial sedimentation, and also by a treatment with chloride of lime. These methods of treatment, in addition to the raising of the dam, have materially reduced the trouble from algae, as well as lessening the chance of infection, and I think it is shown by the weight of the proof, especially by the testimony of Professor Switzer, which appears to me to be clear and convincing, that the water supply for domestic use is and has been for some time reasonably safe and free from impurities and fully as pure and safe as that ordinarily supplied for domestic purposes in other cities. It likewise appears that it is reasonably free from algae, and that a reasonable effort has been made to eliminate this annoyance. At times there has also been a difficulty with the water due to the presence of the stenothrix or iron germ, which has a tendency to discolor clothes when washed with this water. No entirely satisfactory method of dealing with this problem yet appears to have been discovered, but the purifying methods introduced by Professor Switzer, as shown by the daily samples taken from June 20th to November 2, 1915, indicate that this trouble from stenothrix was present only a few days, and that the algae had been practically eliminated.

"As to the matter of electric lights, I find that the company was not, just before the proof was taken, furnishing the full quantity of wattage, measured at the lamps required by the contract. How long this had existed does not appear. This was apparently due primarily to the failure to properly regulate the lamps. Such deficiency as existed however, did not, according to the greater weight of the evidence, in my opinion, perceptibly lessen the light furnished or effect an ordinarily visible impairment of the light; and no data

appear from which the injury to the city, if any, could be reasonably estimated. Practically, however, I think there was no damage done to the city in this respect; and this matter was entirely corrected as soon as it was brought to the plaintiff's attention by the testimony taken at the original hearing.

"The original contract further provided that the plaintiff should install and maintain for the city a horse drinking fountain. This has never been installed. While there is no record of any subsequent contract waiving this feature of the ordinance, it appears that the matter was taken up by former council and a conclusion reached that at a still earlier date the council had waived this fountain for a valuable consideration. The fact that it was so waived for a valuable consideration is not, however, satisfactorily established, though it does appear that the subsequent council understood that it had been waived, and that no demand was thereafter made on the plaintiff to establish the fountain by the present commission or otherwise.

"It furthermore appears from the communication of January 25, 1915, sent by the defendants to the plaintiff before the institution of this suit, and which directly led to this litigation, that no complaint was made by the city with reference either to the amount of water or electric light furnished, either to the city or to private consumers, or to the character of the water; the sole objection to the contract, as expressed in this communication from the city authorities, being that the number of city hydrants and lights provided for by the contract were excessive, the prices too high, and the location of some of the lights and hydrants inadvisable; its sole insistence, before the institution of this suit, being that the number of city hydrants and electric lights should be reduced, the location of some of them changed and half lights substituted for some of the full lights. And I specifically find from the proof that up to the time of the institution of this suit the city had not in any way complained of any alleged nonperformance of the contract by the plaintiff, either in reference to its own water and lights or to that furnished private consumers, except one complaint made some years ago as to the quality of the water before the dam was raised, which seems to have been adjusted to the satisfaction of the committee by the raising of the dam; and that since the dam was raised it has never made any complaint whatever of the service furnished by the plaintiff under the contract, either to the city or to private consumers, or demanded that any improvements be made in such service, either as to quantity or quality. And prior to the accruing of the installments of rental for the collection of which this suit was brought, the city appears to have paid all the installments of rental, both for light and water, as they accrued, with perhaps sometimes slight and incidental delay, without any complaint whatever that the plaintiff was not fully performing the entire contract upon its part. Complaint is also made that the plaintiff has not kept the lights burning the full number of hours required.

"From all the proof, my conclusions in the matter of substantial performance are:

[6] "(a) That as the city accepted the water works with a knowledge that the dam was built in this water shed, which was to be the source of supply, it is only entitled to insist that, except in matters actually inimical to public health, such reasonable appliances and methods be established from time to time, in the light of advancing science, as are adapted to improving the character of the water derived from such source, and is not entitled to resist specific performance of this portion of the contract by reason of minor defects in the water due to the source from which it is and was to be derived, which are not capable of being removed by the use of reasonable appliances and methods, under all the circumstances.

"(b) The plaintiff's right to specific performance, if it otherwise exist, as to the city's part of the contract, can not be defeated by reason of defects either in the quantity or quality of the water, which have been waived by the payment of past accruing rentals without complaint on its part. See, by analogy, Winfield v. Water Co., 51 Kan. 71, 85, 32 Pac. 663; Water Co. v. Lamar, 140 Mo. 145, 39 S. W. 768; Water Co. v. Monroe, 110 Wis. 11, 21, 85 N. W. 685; Water Co. v. Creston, 101 Iowa, 687, 70 N. W. 759.

"(c) The plaintiff has continuously supplied since the dam was heightened

an adequate amount of water for all purposes, both to the city and domestic consumers.

"(d) The quality of the water furnished for fire purposes in the city hydrants has been reasonably adapted for such use, and the city having failed to demand the occasional opening of the hydrants for the purpose of discharging any muddy sediment is not entitled to rely upon the presence of this sediment in the past as constituting a ground for denying specific performance.

"(e) The electric lights have been furnished in substantial accordance with the contract, the technical failure to supply the full wattage not resulting in any appreciable loss or material injury to the city. And this defect has been fully and completely remedied since the institution of the suit and promptly remedied after this defect was first brought to the plaintiff's attention through the evidence in this case.

"(f) That the evidence does not satisfactorily show that the plaintiff has failed to keep the lamps burning during the 'dark hours' of the night, as required by the contract. While there is some evidence tending to show that this is a fact, yet this phrase is itself very indefinite; and in the absence of any evidence tending to show that any complaint was ever made to the plaintiff on this ground or that any insistence was made that the lamps were not kept burning during sufficient hours, the practical construction given this term of the contract by the parties now precludes the city from relying on the possible failure in this regard as a defense to specific performance.

"(g) The water furnished to consumers has at all times been reasonably safe, so far as health is concerned; and the raising of the dam and the improvements installed by the plaintiff before the time the rentals accrued which are now in controversy, rendered the water reasonably free from algae or other minor troubles incident to a water system derived from surface supplies, and reasonably pure and wholesome for use by the inhabitants; and

"(h) Lastly, that on the whole there has been such substantial compliance by the plaintiff with the obligations resting on it under this contract, both as to the public and private supply of facilities, in all matters not waived by the conduct of the city, as to entitle it, so far as this feature of the case is concerned, to specific performance of the contract on the part of the city.

"10. I am furthermore of opinion that the plaintiff, if otherwise entitled to relief, is entitled to have a trust declared in its favor on the special taxes collected for the purpose of paying the water and hydrant rentals, which have, as shown, been collected by the city, and deposited in bank to await the result of this lawsuit, and the payment of such moneys to the plaintiff specifically directed. A special tax levy of 90 cents on each one hundred dollars is provided for this purpose by Sec. 4 of the ordinance. Certainly the legislature could have authorized such special levy in the city charter. And, pretermitting the question whether originally this provision of the ordinance was authorized by the charter, I am of opinion that it was clearly ratified and made effective by Sec. 6 of the Acts approved July 7, 1911, ch. 665, whereby the charter of the city was amended and it was specifically provided that in making the authorized tax levy of two per centum 'full compliance with existing contracts and ordinances for maintenance of public electric street lighting and fire protection by maintaining a water hydrant system *shall be observed*.' Clearly this provision is more than a mere recognition of the existence of the provisions of the ordinance-contract in reference to the special tax levy, and can only be construed as a legislative sanction and recognition of its validity—in fact a mandate that it be performed—thereby plainly validating and confirming the provision in question. Muse v. Lexington, 110 Tenn. 655, 665, 76 S. W. 481; Furnace Co. v. Railroad, 113 Tenn. 697, 87 S. W. 1016; Dill. Munic. Corp. (5th Ed.) § 129.

[7, 8] "11. It does not, however, necessarily follow that the plaintiff is now entitled unconditionally to a decree for specific performance of the city's contract. Detriment to the public may be ground for denying specific performance of the contract, although the plaintiff may be otherwise entitled thereto. 36 Cyc. 620, and cases cited in note 5. Furthermore in cases where hardship develops in the enforcement of the contract due to changed conditions, the court may properly, as a condition of granting to the plaintiff the equitable relief

of specific performance, require it to assent to such equitable modifications of the contract as are just and proper. In Willard v. Tayloe, 8 Wall. 557, 566, 567, 19 L. Ed. 501, the court said: 'It is true the cases cited, in which the discretion of the court is asserted, arose upon contracts in which there existed some inequality or unfairness in the terms, by reason of which injustice would have followed a specific performance. But the same discretion is exercised where the contract is fair in its terms, if its enforcement, from subsequent events, or even from collateral circumstances, would work hardship or injustice to either of the parties. * * * It must also appear that the specific enforcement will work no hardship or injustice, for if that result would follow, the court will leave the parties to their remedies at law, unless the granting of the specific relief can be accompanied with conditions which will obviate that result. If that result can be thus obviated, a specific performance will generally in such cases be decreed conditionally. It is the advantage of a court of equity, as observed by Lord Redesdale in Davis v. Hone, that it can modify the demands of parties according to justice, and where, as in that case, it would be inequitable, from a change of circumstances, to enforce a contract specifically, it may refuse its decree unless the party will consent to a conscientious modification of the contract, or, what would generally amount to the same thing, take a decree upon condition of doing or relinquishing certain things to the other party.'

"I do not think that specific performance of the city's contract should be denied by reason of the alleged hardship to the defendant arising out of the fact that the city revenues have materially decreased since the ordinance was passed owing to loss of revenues from saloons. This was a contingency which should have been contemplated by the parties. Nor do I think it would be just for the court to fix as an equitable condition that the plaintiff should consent to a reduction in either the number of hydrants and lights or the prices to be paid therefor; the plaintiff's plants having been erected and extended on the faith of the city's contracts calling for this number of hydrants and lights at the stipulated prices. And as such prices do not yield more than a fair return on its investment when all the circumstances are considered, it would, in my opinion, be unjust to require a modification of the contract which would seriously impair its earning capacity, as well as impair its ability to make such further improvements as may be from time to time needed in the water, as disclosed by advancing science, and would otherwise tend to impair its ability to carry out in full its contract with the city. I am of opinion, however, from the proof that it is fair and just to require as a condition of granting the plaintiff the equitable relief of specific performance that it assent to the following conditions:

"(a) That it forthwith install and thereafter maintain the horse drinking fountain provided for in the contract; the installation of which does not appear from the proof to have been formally waived for a valuable consideration.

"(b) That it agree to open each of the City hydrants for a reasonable time at reasonable intervals for the purpose of allowing any sediment to escape and keeping the hydrants in good condition for use in case of fire.

"(c) That the term 'dark hours,' as used in the contract as hours which the City lights are to be kept burning be definitely defined by the decree.

"(d) That equitable modifications be made in the contract as to the re-location of certain hydrants and electric lights. The proof shows that owing to the direction in which the town has grown, certain of the hydrants and lights are not now advantageously located, and that it is a hardship on the public to compel the City to pay for all the hydrants and electric lights as now located, from which commensurate benefit is not received. While, as stated, I do not think it would be equitable to require the plaintiff to consent to a modification of the contract reducing the total number of hydrants and lights or the prices to be paid, and thereby materially impair its revenue, I do conclude that it should equitably be required to consent to a re-location of certain hydrants and lights upon just division of the expense incident thereto. It is true that the contract provides for the location of the hydrants and lights by the Board of Public Works of the City; and they appear to have been originally located by

it. The contract does not, however, provide for a subsequent re-location, although it has been the custom of the company to permit a re-location not requiring an extension of mains or of the electric feed wires, provided the City pay the expense. This does not, however, meet the present situation. I am of opinion from the proof that the four hydrants or water plugs set forth in clause '3d' of the City's proposition of January 25, 1916, would be much more beneficial to the City than any of the eight hydrants mentioned in the '2d' clause, which it desires to have cut out; and that it should be permitted on equitable terms to substitute the four new hydrants which it desires for any four which it may select of the other eight. Furthermore I find from the proof that the six half lights mentioned in the '5th' clause of said proposition which it desires to have located would be much more advantageous to the public than the three full lights mentioned in the '4th' clause which it desires to have cut out. And I see no objection to the substitution of six half lights for three full lights, provided the same aggregate rental is to be paid therefor; that is that the same rates be paid for two half as for one full light. I do not think, however, that it should equitably be permitted to cut out any of the hydrants for which others are not substituted or to substitute for full lights merely the half lights in equal number which it desires, as set forth in the '6th' clause of its proposition. It appears from the proof, however, and the map exhibited on the hearing, that to re-locate four of the present water hydrants and to cut out three of the present full lights and substitute six half lights, will require an extension of both of the water mains and the electric pole line. The ordinance, however, provides that the plaintiff shall not be required to make an extension of its mains unless it receives one hydrant contract from the City and three hydrants from private consumers for every four hundred foot extension, nor to extend its pole lines unless it receives a contract from the City for one arc light and three contracts from private consumers for every three hundred foot extension. In view, however, of the hardship to the public in requiring the City to pay full prices for hydrants and electric lights which are disadvantageously located, I am of opinion that as a condition of granting the plaintiff the equitable relief of specific performance, it should be required to assent to a modification of this contract by which the City shall be permitted to substitute the four new hydrants which it desires for any four of the present hydrants of which it complains, and to substitute the six half lights which it desires for the three full lights to which it objects, upon condition that one-half of the expense incident to such substitution, including the cost of extending the water mains and the electric pole lines, and the cost of installation of new hydrants and new lamps, shall be paid by the plaintiff and one-half by the City. This, after careful consideration, is, I think, a fair and equitable condition under all the circumstances.

"(e) It should further, in my judgment, be an equitable provision of the decree for specific performance that the plaintiff consent that this cause shall be retained on the docket to the end that if at any time the plaintiff shall fail to perform its part of the contract or advancement in science shall disclose new methods of improving the water, which can be installed at a reasonable expense and which can reasonably be required of the plaintiff in a water works system of the character in question, considering all the surrounding circumstances, or the water should become from any cause dangerous to the health of the inhabitants, the defendant shall have leave to apply to the court in supplemental proceedings for such relief as it may be entitled to receive in the premises as a condition of keeping the decree for specific performance in full force and effect. See as to such supplemental proceedings: Joy v. St. Louis, 138 U. S. 1, 47, 11 Sup. Ct. 243, 34 L. Ed. 843.

"If, therefore, the plaintiff consents to the equitable conditions hereinabove indicated, a decree will be entered providing that upon these conditions it is entitled to enforce the contract rights vested in it against the City under the original and amended ordinances, and to be paid by the City the agreed rentals as they from time to time mature, and enforcing specific performance of such obligations by requiring the City from time to time to make the tax levies provided for by the contract for the purpose of paying the rentals and to pay over to the plaintiff the proceeds of such tax levies as have heretofore

been collected by it and are now held in trust by the City for the purpose of paying the rentals now due.

"Since, however, the testimony heretofore taken does not show whether the plaintiff has continued up to this time to furnish the City with water and lights, nor the amount of rentals now due from the City, nor the amount of the tax levies made and collected, or any facts from which the court can properly define as a basis of future conduct the meaning of the term "dark hours," as used in the contract, nor fix reasonable requirements as to the opening of hydrants, and as to the kind of fountain to be installed, the case will be reopened for further proof upon these questions. If the parties so desire, they may at any time within two weeks from this date file a stipulation as to any of these matters; and such as may not be covered by such stipulation will be open to proof, which will be heard in open court at a time and place to be hereafter fixed, upon application of either of the parties.

"The entry of a decree in accordance with this opinion will await the filing of said stipulation or the taking of such additional proof.

"One-fourth of the costs of the cause heretofore accrued will be awarded against the plaintiff and three-fourths against the City."

After the filing of Judge Sanford's opinion the parties, in open court, stipulated as to the amount of rentals due from the city to February 1, 1917, and the amount of tax levies for water and light rentals collected and on hand, as well as to the method of performance of conditions (a) and (b) and the definition of the term "dark hours" in condition (c) of paragraph 11 of the opinion, agreeing, also in open court, to the retention of the cause upon the docket for the purpose stated in subdivision (e) of that paragraph. Defendant waived the immediate execution of condition (d), relating to the relocation or substitution of hydrants and electric lights, reserving, however, the right to thereafter call for its execution. Appellee also formally assented to the terms on which its relief was conditioned. Within such limitations, appellee was given decree for specific performance to the extent stated in the opinion, with declaration of trust on the taxes which had been collected; defendant being required to pay over the amount already due and to make good the deficiency in the amount levied. It is stipulated that defendant has paid to appellee all the sums due at the date of the decree below, and that appellee has in all respects complied with the terms of the decree relating to conditions (a), (b), and (c) above mentioned.

"The appellants insist here, as in the district court, that the ordinance contract of 1905 is for various reasons void and nonenforceable. The more prominent grounds of this contention sufficiently appear from Judge Sanford's opinion and from what has already been said in this statement. Appellants also insist here that if the contract is to be enforced it should only be upon the further conditions that the number of hydrants and lights be reduced and that effective water filtration be installed.

J. A. Fowler, of Knoxville, Tenn., and L. H. Carlock, of La Follette, Tenn. (H. G. Fowler, of Knoxville, Tenn., of counsel), for plaintiffs in error.

Charles T. Cates, Jr., of Knoxville, Tenn. (J. Will Taylor, of La Follette, Tenn., of counsel), for defendant in error.

Before KNAPPEN and DENISON, Circuit Judges, and COCHRAN, District Judge.

PER CURIAM. The view we take of the merits of the case makes it unnecessary to consider appellee's motion to dismiss the appeal, on the ground that appellants waived their right thereto by accepting the benefits of the terms of the decree in their favor, imposed on appellee as conditions of granting it relief.

After careful consideration of the record, and of the able and thorough briefs and arguments of counsel, we are convinced that Judge

Sanford made an eminently proper disposition of the case. His pains-taking discussion of both the testimony and the applicable law make extended discussion on our part unnecessary.

In our opinion, and for the reasons stated by Judge Sanford, the ordinance contract is valid and enforceable, so far at least as it is in-volved here; that is to say, so far as it relates to the city's contract in its proprietary capacity for a public supply of water and light; and this is as far as we have any occasion to consider.

Upon the equities we think appellants have no ground of complaint. We are impressed that the record will not justify further modification of the contract than provided by the decree with respect to hydrants and lights; that the increased storage capacity and the chemical treat-ment installed have rendered the water supply reasonably pure and wholesome; and that the retention of the cause upon the docket un-der subdivision (e) of paragraph 11 of the opinion affords additional and reasonable assurance against future danger to health.

The decree of the District Court is affirmed.