**FREIDCO OF WILMINGTON, DELAWARE, LTD., a Texas limited partnership Debtor-In-Possession under Chapter XII of the Bankruptcy Act of the United States, and Unit, Inc., a Texas corporation, Debtor-In-Possession under Chapter XI of the Bankruptcy Act of the United States, Plaintiffs,**

v.

**The FARMERS BANK OF the STATE OF DELAWARE, Defendant.**

Civ. A. No. 76–149.

United States District Court,
D. Delaware.

Nov. 12, 1981.

Michael G. Kohn, Kohn & Helmer, Cincinnati, Ohio, for plaintiffs.

Max S. Bell, Jr., and Robert J. Katzenstein, of Richards, Layton & Finger, Wilmington, Del., for defendant Farmers.

Peter J. Walsh, of Murdoch & Walsh, Trustee, F. Alton Tybout, of Tybout, Redfearn, Casarino & Pell, Wilmington, Del., for trustee of Freidco.

Thomas G. Hughes, of O'Donnell & Hughes, Wilmington, Del., for FDIC.

## OPINION NO. III

STAPLETON, District Judge:

Freidco of Wilmington, Ltd. ("FW") is a Texas partnership which, in April of 1974, consisted of Unit, Inc. ("Unit"), as general partner, and two Wilmington realtors, Robert Hickman and Harry Tingle, as limited partners. FW owned the Farmers Bank Building. On April 12, 1974, Unit committed itself to deposit all rental payments received on behalf of FW from tenants of the building to a designated checking account and, simultaneously, authorized the Farmers Bank of the State of Delaware ("Farmers") "to charge this account $10,000 per month as rental payments are credited" and to apply these withdrawals in satisfaction of indebtedness of Unit to Farmers. This arrangement was to last until all such indebtedness was paid. On July 31, 1974, Unit entered into an arrangement with others of its creditors ("the Dayton Group") under which it caused additional monthly diversions to be made from FW's rental receipts in satisfaction of Unit's obligations. Pursuant to these two agreements, Unit diverted almost $15,000 per month of FW's rental receipts. This proved too heavy a burden for FW, which filed a petition in bankruptcy on September 8, 1975.

FW's Trustee in Bankruptcy has sued Farmers to recover the money it received under the April agreement. He has also filed a crossclaim against Unit for the unlawful diversion of partnership property, and for the assignment of partnership property in violation of Texas law. Unit asserts a right to indemnification by Farmers if it is found liable to the Trustee, on the ground that Farmers' actions leading to the April agreement amounted to economic coercion. The FDIC, by assignment from Farmers, relies upon the April agreement to revive an assignment of rents in the Farmers Bank Building to secure Unit's debts to the Bank. I have grouped these claims together because they all revolve around a single factual nucleus. This Opinion comprises the Court's findings of fact and conclusions of law.

## I. BACKGROUND

In 1964 Winn-Lee, Inc., subsequently renamed Unit, Inc., formed a real estate development partnership with Gary Aenchbacher called Freidco. At about the same time, Farmers Bank had purchased land in downtown Wilmington as a site for a new headquarters office building. Rather than develop the property itself, it decided to arrange a sale and leaseback transaction with a professional developer. Robert Hickman, a director of the Bank as well as a realtor, put together a deal between the Bank and the original Freidco partnership. The General Electric Pension Fund Trust held title to the land, Freidco obtained a long term ground lease, and Farmers signed a lease for approximately 40% of the office space. To secure Freidco's mortgage of $7.5 million, Freidco assigned Farmers' rental payments to GE.

Farmers and Freidco signed the Lease on May 14, 1965. Construction began, and on August 10, 1966, FW was formed to operate and own the new building. Hickman and Tingle became partners in the new entity, and agreed to manage the Farmers Bank

Building in exchange for a share of the cash flow. Tingle eventually delegated all of his managerial responsibilities to Hickman, who carried them out through the Emmett S. Hickman Co. Gary Aenchbacher withdrew from both the FW and "old Freidco" partnerships before Farmers commenced occupancy on April 1, 1967.

Over time, the commercial dealings among the parties involved in the Farmers Bank deal became more complex. In late 1966, Unit formed a joint venture to develop property located at 800 Delaware Avenue in Wilmington with Hickman, who had a 20% interest, and Marvin Lewis, who owned 2½%. Farmers agreed to loan $700,000 to the venture, but insisted that Unit borrow the money in its name alone. The parties entered a formal joint venture agreement on September 21, 1967, and commissioned the Emmett S. Hickman Co. to manage the new property.

Shortly thereafter, Unit embarked on yet another project. With Hickman and Tingle as limited partners, Unit agreed to develop property at 300 Delaware Avenue for the new Bank of Delaware building. This partnership,* the membership of which was identical to that of FW, obtained a $150,000 loan from Farmers in 1970, secured by an assignment of all rents and leases derived from the Farmers Bank Building. Unit paid back the loan on behalf of the partnership on October 20, 1971. Farmers returned the note which Unit had executed stamped "Satisfied of Record." Farmers also returned the original of the recorded assignment of rents and leases, but did not stamp the assignment "satisfied of record." Farmers' counsel advised Unit that the assignment "automatically ceases with the satisfaction of the $150,000."

Relations between landlord and principal tenant, and among the FW partners, were close during the early years. In October 1971, Farmers acquired the Emmett S. Hickman Co. and changed its name to Hickman & Company. Hickman acquired a new title, and new duties, as Senior Vice President of the Bank.

Unit borrowed an additional $20,000 from Farmers, payable in thirty days, on June 23, 1972. Unit kept its interest payments current, but did not retire any of the principal. Financial pressures on Unit increased, and in late 1973 and January 1974 William Morris, the president of Unit, attempted to negotiate a sale of FW's interest in the Farmers Bank Building to Farmers. During the course of these negotiations Daniel Kristol, an attorney for Unit, performed a title search and discovered the assignment of leases. On February 13, 1974 he wrote to Farmers and requested that the Bank cancel the assignment on the record. Farmers replied that the assignment, which applied to "all other obligations" of Unit, had not been satisfied because Unit still owed the bank $20,000 on the June 23, 1972 note, a note which Unit had executed more than six months after Farmers had advised Unit that the assignment had automatically ceased.

In a letter dated February 25, 1974, Hickman & Co. expressed concern that it had not been paid for management services at 800 Delaware Avenue since November 1, 1971, the first month after Farmers acquired the firm. On March 19, Hickman & Co. demanded payment of $24,533.94 in fees by April 1, 1974 and provision for regular payments in the future. The telegram informed Unit that Hickman & Co. would discontinue management services effective April 30, if its demands were not met.

The following day, March 20, Farmers itself sent a telegram to Unit, demanding immediate payment of the $450,000 balance due on the 800 Delaware Avenue mortgage and the $20,000 note. Unit asked for, and obtained, an extension of time to respond.

On April 12, Unit proposed an extension of additional credit and repayment of its existing debts as well as its new obligations over a seven year period from the cash flow of the Farmers Bank Building and another building Unit owned. Farmers rejected this offer. At some point during Farmers' efforts to collect the $470,000 which Unit

* The name of the partnership was Delaware Avenue Associates.

owed, Farmers indicated that it would seize the Farmers Bank Building rents, relying upon the 1971 assignment. Unit's president subsequently described the assignment as "a gun to our heads."

Farmers' counterproposal required Unit to agree as follows:

1. Unit, Inc., as general manager of Freidco of Wilmington, Delaware, Ltd., authorizes Hickman and Company, its managing agent for the Farmers Bank Building, to continue to make deposits of all rentals received by it into Freidco's account # 0302 028 5 and will advise the Bank as these deposits are made.

2. Unit, Inc. authorizes Farmers Bank to charge this account $10,000 per month as rental payments are credited to the above-mentioned account. Farmers Bank may make one or more charges at its discretion up to $10,000 total against any month's rent rolls.

\* \* \* \* \* \*

4. Unit, Inc. acknowledges that the assignment of Farmers Bank Building leases now of record from Unit, Inc. to Farmers Bank will remain as a recorded lien to secure the above arrangement and all indebtedness of Unit, Inc. to Farmers Bank, including its subsidiaries.

Farmers' letter conveying this proposal demanded that Morris sign and return the letter by April 26, 1974. Farmers promised to initiate foreclosure of the 800 Delaware Avenue mortgage if it did not receive the signed agreement by that time.

Unit capitulated on April 26. From May 1, 1974 through September 1975 Farmers withdrew $10,000 per month from the account specified in the agreement.** (X–2009). In October 1974 Farmers took only $5,000 because the balance in the account was insufficient to permit the usual with-

drawal.[1] In all, Farmers withdrew $165,000 from the FW account.

Unit compounded the effect of the April agreement with Farmers in July of 1974. The agreement Unit entered with the Dayton Group recited Unit's $400,000 debt to the group and provided a complex arrangement under which Unit assigned a portion of its interest in the profits of FW (though not its losses) subject to the right of Unit to repurchase that interest. In addition, the agreement guaranteed that whatever was distributable monthly to the Dayton Group on its interest pursuant to the terms of the partnership agreement, those distributions would not be less than $4,666.67. Pursuant to this agreement, Unit wrote monthly checks to the Dayton Group in that amount from the account to which it was depositing FW's rental receipts. (X–2010). All told, the Dayton Group received $50,750 of FW's rental receipts.

Both the April transaction and the July transaction were in substance assignments of FW's partnership assets. Despite Unit's present assertions to the contrary, neither was in fact intended as an assignment of Unit's interest in partnership profits. Payments were to be made without regard to Unit's interest in the partnership profits and, as will be developed more fully hereafter, at least Farmers and Unit, if not the Dayton Group, knew full well at the time of the transactions that Unit's interest in partnership profits would not be anywhere near sufficient to cover the payments.

Between May of 1974 and September of 1975, Unit paid itself an additional $69,518 in partnership draws and management fees. Another $18,397 in partnership funds was paid to the City of Wilmington and Southwestern Bell Telephone on behalf of 800

---

** Farmers contends that because "old Freidco" opened the account, and Unit was the only remaining partner, it had no reason to consider deposits into that account FW's property. The record shows otherwise. Farmers listed that account as belonging to FW, knew that the deposits were from rental income owing to FW, and was familiar with the history of the FW partnership.

1. Beginning in July of 1975 Farmers allocated $2,000 per month to the payment of FW's sublease obligations. As I have found elsewhere in this complex litigation, the disputed sublease obligations were legitimate obligations due to Farmers from FW. Accordingly, I find no impropriety in this set-off of an FW obligation against the funds in the account.

Delaware Avenue Associates. These payments were ultimately charged on FW's books to "Unit draws". The over $300,000 credited against Unit's shares of the partnership income during the twenty-two months prior to FW's petition in bankruptcy vastly exceeded what Unit had any reason to believe was its partnership draw. In 1972 and 1973, Unit drew only $43,500 and $31,000, respectively, a total over twenty-four months only one-quarter of what Unit took the following year. During the period in which this $300,000 was credited against Unit's share of partnership income, FW accumulated some $340,000 in back taxes due and payable to the City of Wilmington.

## II. THE TRUSTEES' CLAIMS AGAINST FARMERS AND UNIT BASED ON THE APRIL AND JULY 1974 TRANSACTIONS.

The Trustee seeks to recover from Unit and Farmers the $161,000 [2] which they caused to be taken from FW rent receipts and applied in satisfaction of liabilities of Unit and other Unit ventures. He also seeks to recover from Unit the FW rent receipts which Unit diverted to the Dayton Group in satisfaction of Unit's indebtedness to its members. The Trustee acknowledges that he has not proved that FW was insolvent at the time of any of these transfers.

The Trustee's characterization of the facts of this case is apt: "Unit took money which did not belong to it and should be required to give it back." Despite the simplicity of the Trustee's claim, demonstration of his right to relief requires a more extended discussion.

### 1. The Basis Of The Trustee's Rights

I begin with what I believe to be the indisputable propositions that, absent the consent of all partners, Unit had no authority under Texas law to commit the partnership assets of FW to the payment of non-FW obligations and that, after it did so, each non-consenting partner had the right to avoid those transfers with respect to any transferee who took with notice of the facts.

Section 10 of the Texas version of the Uniform Limited Partnership Act,[3] Tex. Rev.Stat.Art. 6132a § 10, specifically provides that:

> without the written consent or ratification of the specific act by all of the limited partners, a general partner ... [has] no authority to:
>
> *       *       *       *       *       *
>
> (4) ... assign its rights in specific partnership property, for other than a partnership purpose.[4]

■ The corollary to this proposition is that a partner has a right to have partnership assets utilized solely for partnership purposes and, more specifically, has a right to have partnership property applied to meet partnership debts. *E.g., Case v. Beauregard*, 99 U.S. 119, 25 L.Ed. 370 (1879); 1A Collier, *Bankruptcy* § 5.28 (14th ed. 1978). As a result, a non-consenting partner can void a transfer under Texas law which was made in satisfaction of an individual obligation of a co-partner. *Pride v. Brandon*, 227 S.W.2d 385 (Tex.Civ.App. 1950). This is consistent with partnership law as generally applied. *E.g., McNair v. Wilcox*, 121 Pa. 437, 15 A. 575 (Pa.Supr.Ct. 1888). It is likewise true that the non-con-

---

**2.** The $165,000 diverted from the FW account less the $4,000 applied to FW's sublease obligation. *See* footnote 1 on page 839.

**3.** Unit argues that the FW partnership agreement itself is contrary to Texas law, *see* Tex. Rev.Stat.Art. 6132a §§ 2, 5. Therefore, Unit urges, Hickman and Tingle are general, not limited partners. I agree that aspects of the agreement appear inconsistent with the limitations of limited partnership. Nevertheless, this avails Unit nothing. The Texas Partnership Act establishes substantively identical con-

straints on the partner of a general partnership. Tex.Rev.Stat.Art. 6132b § 25(2)(a) and (b).

**4.** Unit also argues that it did not violate Section 10 because FW's rental receipts were not "specific partnership property". I conclude, however, that the phrase "rights in specific partnership property" is here used only to distinguish a partner's interest in the partnership as a whole and that, in this context, FW's right to rent receipts was specific partnership property.

senting partner can pursue the partner responsible for the conversion.[5] *Case v. Beauregard, supra.*

■■■ The remaining question is whether these rights of a non-consenting partner are possessed by a Trustee in the event of a bankruptcy of the partnership. The answer, I conclude, is in the affirmative. It is well settled law that creditors are subrogated in the event of bankruptcy to the right of a non-consenting partner to have partnership assets applied in satisfaction of partnership debts. The Supreme Court explained the legal theory on which this conclusion rests in *Case v. Beauregard, supra*, 99 U.S. at 124–25, 25 L.Ed. 370:

> No doubt the effects of a partnership belong to it so long as it continues in existence, and not to the individuals who compose it. The right of each partner extends only to a share of what may remain after payment of the debts of the firm and the settlement of its accounts. Growing out of this right, or rather included in it, is the right to have the partnership property applied to the payment of the partnership debts in preference to those of any individual partner. This is an equity the partners have as between themselves, and in certain circumstances it inures to the benefit of the creditors of the firm. The latter are said to have a privilege or preference, sometimes loosely denominated a lien, to have the debts due to them paid out of the assets of a firm in course of liquidation, to the exclusion of the creditors of its several members. Their equity, however, is a derivative one. It is not held as enforceable in their own right. It is practically a subrogation to the equity of the individual partner, to be made effective only through him. Hence, if he is

not in a condition to enforce it, the creditors of the firm cannot be. * * * But so long as the equity of a partner remains in him, so long as he retains an interest in the firm assets, as a partner, a court of equity will allow the creditors of the firm to avail themselves of his equity, and enforce, through it, the application of those assets primarily to payment of the debts due them, whenever the property comes under its administration....

In *Ryan v. Cavanaugh*, 238 F. 604 (S.D. Iowa 1916), the court was confronted with a situation in which a trustee in bankruptcy had sued to recover notes which were the property of the bankrupt banking partnership but which had been transferred by a partner in satisfaction of his own individual debt. The court directed the return of the notes, relying upon the

> settled doctrine that, where partnership assets are used by one partner to pay his individual debt without the consent of his copartners, the non-consenting partner has the right to recover the property, and in case of bankruptcy, the trustee has the same right.

238 F. at 607. This "settled doctrine" is still the law. Crane & Bromberg, *Partnership*, § 95 at 556–57.[6]

The fact that such a transfer is voidable by a creditor means that it is also voidable by the Trustee. Section 70(e) of the Bankruptcy Act [7] provides in part:

> (1) A transfer made or suffered ... by a debtor adjudged a bankrupt under this title which, under any Federal or State law applicable thereto, is ... voidable for any ... reason by any creditor of the debtor having a claim provable under this title, shall be null and void against the trustee of such debtor.

---

5. At common law there were many instances in which one partner could not sue another absent an accounting. Under Texas law, however, an accounting is not a prerequisite to an action by one partner against another when the facts are such that an accounting is unnecessary. *Morgan v. Steinberg*, 23 S.W.2d 527 (Tex.Civ.App.); *Pride v. Brandon, supra*. I would expect this rule to be applied in a simple conversion case.

6. "... where a partner has fraudulently diverted firm property to his separate estate without the knowledge or assent of his co-partner, restitution should be made."

7. This case was filed before enactment of the new Bankruptcy Code, P.L. 95–598, 92 Stat. 2549 (1979).

(2) All property of the debtor affected by any such transfer shall be and remain a part of his assets and estate and shall pass to, and every such transfer shall be avoided by, the trustee for the benefit of the estate. . . .

I read this Section to authorize claims like that which the Trustee here asserts against Farmers.

▬ It is true that Section 70(e) does not apply to the Trustee's conversion and breach of fiduciary duty claims against Unit. This fact is not fatal to these claims, however. Section 70(a)(6) transfers to the Trustee, by operation of law, the bankrupt's interest in any "rights of action arising upon . . . the unlawful taking or detention of . . . his property." While this section speaks of vesting the Trustee "with the title of the bankrupt" to property of this kind, it seems apparent that, when applied to a partnership context, Congress intended no distinction between rights enforceable by the partnership prior to the bankruptcy and rights enforceable by a partner for the benefit of the partnership. *See* Crane & Bromberg, *Partnership* at 293.[8] Thus I conclude that the claims here asserted by the Trustee against Unit may be pursued under Section 70(a)(6).[9]

### 2. *The Alleged Consent And Estoppel Of Unit's Co-Partners.*

The Trustee's rights under the foregoing analysis derive from rights of non-consenting partners and it must be acknowledged that, if all FW partners had authorized the challenged transfers, the Trustee and the creditors he represents can have no interest in the transferred funds. 1A Colliers, *Bankruptcy*, § 5.28 (14th ed. 1978). Farmers and Unit maintain that this is such a case. They also contend that Hickman and Tingle are estopped by their misconduct from attacking their transactions and, accordingly, that the Trustee is thus also estopped. I am unable to accept either proposition.

Unit's ratification argument is without merit. Hickman, in his capacity as an officer of the Bank, knew about the letter agreement and Farmers withdrawals. He even helped to fix the amount which Farmers would take. His failure to protest, under the circumstances, bespeaks consent. But the record does not support the claim that Tingle also ratified the April agreement. It shows that Tingle became disturbed when the partnership cash flow payments stopped as a result of the April agreement and the statements of account showed large and unusual expenses. Tingle wrote to Pauline Bond, Unit's controller, to demand an explanation.

Unit seeks to impute Hickman's consent to Tingle because Tingle delegated his managerial responsibilities to Hickman. Although it is true that after he left the Hickman company, Tingle no longer played an active role in the management of the Farmers Bank Building, the record does not show that Tingle authorized Hickman to make all decisions regarding Tingle's partnership interest. The delegation of authority to Hickman to fulfill Tingle's responsibilities with respect to the management of the building clearly did not authorize Hickman to consent on Tingle's behalf to substantial diversions of partnership property.

Although it is possible to infer ratification from a failure to repudiate, 68 C.J.S. *Partnership* § 173 at 626; *Restatement (2d), Agency* § 94, the record in this case will not support such an inference. As earlier noted, when Tingle noticed the "abrupt change" in the statements Unit sent to him, he wrote to Unit for an explanation. Moreover, Hickman did explain the April agreement to Tingle at some point after the fact and Tingle indicated that it infringed his interests because it involved a debt of 800 Delaware Avenue Associates, a venture in which he had not taken part. Not only has

---

8. At common law there were, of course, no rights which were enforceable directly by the partnership since it was not regarded as a distinct jural entity. *E.g.*, Am.Jur.2d, *Partnerships*, § 322.

9. *Cf. In re Decker*, 295 F.Supp. 501, 512–13 (W.D.Va.1969).

Unit failed to satisfy its burden of showing ratification, *see Baldwin ex rel. Baldwin v. Loesel*, 333 Pa. 26, 3 A.2d 389 (Pa.1939), the facts tend to show the contrary.

Unit's claim to ratification of its agreement with the Dayton Group is also flawed. Hickman and Tingle did authorize Unit to amend the partnership agreement to add the new partners. But it was not the partnership agreement which occasioned the diversion of FW's rental receipts to the satisfaction of Unit's obligation. There is no evidence that Hickman or Tingle consented to guaranteed monthly payments to the Dayton Group from rental receipts without regard to whether they were entitled to any distribution under the partnership agreement.

Turning to Unit's charges of misconduct, it is true that Hickman breached his fiduciary duty to the partnership. But Unit does not even contend that the same was true of Tingle. Unit does assert that Tingle knew that Farmers was underpaying its rent on the sixth floor, and that the bill to Farmers for electricity consumed by the Farmers Bank outdoor sign was justified, but failed to disclose these facts to Unit. The sign electricity bill was no secret to Unit,[10] however, and Farmers' alleged underpayment on the lease are simply not proven on this record. Moreover, even if Tingle did have knowledge of this kind and failed to make an appropriate disclosure, this hardly places him in *pari delicto* with Unit.

### 3. *Farmers' Good Faith Defense.*

Farmers asserts that it acted in good faith in taking the $10,000 per month from the FW account. In connection with this argument, I assume without deciding that Farmers would not be liable if it reasonably believed the amounts taken represented Unit's share of the partnership cash flow, whether or not Unit violated Texas law in entering the April 1974 letter agreement. Even if the legal premise of Farmers' argu-

ment be accepted, however, it must fail for want of factual support.

The evidence before the Court supports the conclusion that Farmers did not believe it was taking Unit's rightful share only, and that if it did so believe, that belief was so objectively unreasonable as to amount to bad faith. At trial Henry Wales, Farmers' Executive Vice-President, testified that he had discussed the amount that the bank could take with Robert Hickman. Hickman's estimates of the partnership cash flow, compiled from the information he obtained as the building manager, showed that the total partnership cash flow for 1974 would be no more than $88,000, and probably much less. In that event, Unit's share would be slightly less than $6,000 per month. In July of 1974, Hickman revised the estimate downward to about $55,000. Unit's share of the smaller figure would be less than $5,000 per month. Yet Farmers continued to draw $10,000 monthly.

Wales's deposition testimony persuades me that Farmers' concern was not with Unit's fair share of the partnership income, but with how much the bank could take before disabling FW from meeting its expenses. Neither Hickman nor Wales ever produced anything to show that they believed, or had any reason to believe, that Unit was entitled to $10,000.

The evidence satisfies me that Farmers proceeded to take $10,000 per month from FW, without regard to whether that money represented Unit's share of the partnership cash flow. Indeed, Farmers had ample reason to know otherwise.[11]

### 4. *Liability.*

Unit was not authorized to enter the April 1974 and July 1974 agreements insofar as they purport to transfer an interest in FW rent receipts in satisfaction of non-FW liabilities. All funds applied by

10. *See* Opinion No. I in this case of November 12, 1981, pp. 4–5.

11. Farmers claims that it was only because Unit had guaranteed $4,667 per month to the Dayton Group that its total draws on the part-

nership proved excessive. The evidence shows that Farmers' withdrawals alone were greater than Unit's fair share, as Farmers was well aware. *See, e.g.* X–1566.

Farmers to such liabilities must be returned by it to the Trustee. It may, of course, seek to recover from Unit on the original obligations. Unit will be held responsible to the Trustee for any funds which it diverted to meet its own obligations, including those diverted to satisfaction of its obligations to the Dayton Group, and which are not otherwise recovered by the Trustee.

## III. CLAIMS AGAINST UNIT ARISING FROM CHECKS PAYABLE TO UNIT OR ON ITS BEHALF.

During the twenty-two months prior to FW's bankruptcy filing, Unit caused an additional $88,455 in checks to be written on FW funds payable either to Unit or to others on behalf of Unit and other Unit ventures. Of the $69,518 in checks payable to Unit, $4,981 are justified as "management fees" and the remainder are justified as partnership draws. Of the $18,937 in checks payable to others, all are now justified as Unit partnership draws. The Trustee challenges these payments on the grounds that Unit was not entitled to management fees and that, at the time the draws were made, there was no "net cash receipts" from which to draw because of the accumulation of unpaid taxes.

As of January 1, 1974, FW had a tax liability of $134,758 which had been past due since August 31, 1973. An additional $193,990 came due in August of 1974. By September of 1975, when FW filed its bankruptcy petition, FW had a past due tax liability of $345,880. In only one month during the twenty-two month period from January 1974 to September 1975, did FW have funds available to distribute to the partners after satisfying, by payment or funding, its *past due* tax liability.[12] FW's ground lease with the G.E. Pension Trust required it to pay real estate taxes "during the period in which the same shall be payable without penalty" (X–2302) and defines events of defaults to include the failure to pay such taxes when due.

In support of the propriety of its draws, Unit points to the provision of the partnership agreement providing for FW's books to be maintained on a cash basis and asserts that it reflects an intention that no tax expense would be charged against income until a tax payment was in fact made. Unit also contends that it was cheaper for FW to withhold tax payments as long as possible and to pay the resulting penalties rather than to borrow money from other sources to pay the taxes when due.

While it is true that FW's books were to be kept on a cash basis and that the penalty charged by the City compared favorably with bank interest rates during the relevant period, it does not follow that Unit's draws were made from Unit's share of available "net cash receipts." "Net cash receipts" is the yardstick governing distribution under the partnership agreement. The parties defined that term with specificity.[13] That definition suggests the conclusions that the parties may not have a pure cash basis accounting system in mind where such distributions were concerned and the practice of the parties under the agreement confirms this suggestion. The accounts which Unit was required to prepare periodically as a basis for making distribution to partners, uniformly charged accrued taxes against receipts in calculating net cash receipts.[14]

12. If one takes into account accrued tax liability, as well as past due tax liability, there was no month in which there were "net cash receipts".

13. The term "net cash receipts of the Partnership", as used in this agreement, shall mean net profits derived from the ownership of the Real Property as ascertained through the use of standard accounting practices, except that (i) depreciation of buildings, improvements, and personalty shall not be considered as a deduction, (ii) mortgage amortization shall be considered as a deduction, (iii) any amounts expended by the Partnership in the discretion of the General Partners for capital improvements shall be considered a deduction, and (iv) if the General Partners shall so determine, a reasonable reserve shall be deducted for working capital needs or to provide funds for improvements or for any other contingencies of the Partnership.

14. Given the figures during this twenty-two month period, it would appear that I need not resolve whether the parties contemplate that taxes would be charged against receipts only when they became due or whether they con-

Moreover, the parties to the partnership agreement expected that the partnership affairs would be conducted by Unit "in a prudent manner, with due caution and in accordance with good practice in the industry." (Art. IX, Partnership Agreement). This clearly suggests that they did not contemplate the withdrawal of funds from the partnership business without regard to whether provision had been made for the payment of expenses essential to the very survival of that enterprise. Specifically, I consider it highly unlikely that the parties intended that partnership distribution would be made without regard to the existence of matured obligations the nonpayment of which would result in a forfeiture of the only significant asset of the partnership. Finally, nothing in the partnership agreement suggests that the manner in which the general partner might choose to finance the payment of currently due taxes would entitle it to ignore all tax obligations until such time as it chose to pay them.

Turning to the management fee issue, the partnership agreement provided that, as a general rule, Unit would receive no compensation for managing the partnership business, but did authorize it to enter into a "leasing and management services" contract with FW which would provide for a commission not in excess of five percent (5%) of the gross income of the partnership. Unit entered into such a contract on March 1, 1975, and made the disputed payments to itself in May and June of that year. Those payments are within the 5% authorization. The problem for Unit, however, is that in the context of the partnership agreement and the March 1, 1975 contract, the phrase "leasing and management services" refers to leasing and *building* management services of the kind provided by Hickman & Co. As I read Unit's brief, it does not assert that it performed any services of these kinds for FW. Rather, Unit's claim is that

it "employed supervisory management personnel to oversee the operation of the Farmers Bank Building", that is, to oversee those who were providing building management services. Accordingly, I conclude that the services for which the management fees were allegedly paid were never performed.

It follows that the $88,455 which Unit caused to be withdrawn from FW funds during the twenty-two months preceding its bankruptcy were withdrawn in violation of the partnership agreement. I do not understand Unit to claim that all partners gave their informed consent to these withdrawals. While Hickman and Tingle received some partner distributions from FW during this period, the accounting which they received along with those distributions indicated that provision was being made for taxes. Accordingly, I conclude that at the time of bankruptcy Hickman and Tingle had contractual rights to have these funds returned to the partnership business. I further conclude that these claims passed to the Trustee under that portion of Section 70(a)(6) of the Bankruptcy Act[15] which vests the Trustee with the bankrupt's "rights of action arising from contracts."[16] Thus, relief will be granted on this claim.

## IV. THE FDIC CLAIM.

The Federal Deposit Insurance Corporation, by assignment from Farmers Bank, claims a security interest in the rental receipts of the Farmers Bank Building by virtue of the 1970 Assignment. This purported security interest would be likely to yield a larger return than the pro rata dividend payable to the FDIC in either the Unit or FW bankruptcies.

It is undisputed that the 1970 Assignment was made as security for an indebtedness of FW which was fully satisfied in 1971 and that that assignment terminated as of that time. The FDIC's claim, accordingly, depends upon the contention

templated that taxes would be accrued on a monthly basis prior to their due date.

15. 11 U.S.C. § 110(a)(6).

16. As noted above, I do not believe Section 70(a) intended to distinguish between partnership rights of action and rights of action of partners with respect to partnership affairs.

that this assignment was revived by the letter agreement of April 20, 1974, in which Unit purported to:

> acknowledge that the assignment of Farmers Bank Building leases now of record from Unit Inc. to Farmers Bank will remain as a recorded lien to secure the above arrangements and all indebtedness of Unit, Inc. to Farmers Bank including its subsidiary.

For the same reason that Unit could not assign the rental income to Farmers by authorizing it to make monthly withdrawals from the FW account, Unit could not assign partnership property by reviving a prior agreement without the consent of its partners. The record shows that Harry Tingle did not consent.

## V. UNIT'S INDEMNIFICATION CLAIM AGAINST FARMERS

Unit urges that if it is held liable to the Trustee as a result of the April 1974 transaction, Farmers must indemnify it with respect to that liability because Farmers "coerced" Unit to enter that transaction. Unit initially cites cases holding that a party may rescind or avoid a contract when a wrongful act of another deprived him of the ability to exercise free choice at the time of contracting. Unit goes on to assert, without citation of relevant authority, that Farmers' conduct was "tortious" and "created an implied promise to indemnify Unit for any losses caused" by that conduct.

■ If Unit's arguments had some basis in fact, they would nevertheless be legally unavailing. The problem with the April 1974 agreement was that FW's assets were diverted to satisfy Unit's liabilities to Farmers. If Unit were permitted to disavow that agreement on grounds of coercion and this somehow created an affirmative right against the bank, those liabilities would necessarily be revived and the bank would have a set-off in an amount equal to the Unit liabilities satisfied with FW assets. Similarly, as to any other tort of contract claim, the satisfied liabilities would have to set set off against an equal amount of "damage".

Moreover, there is no factual support for Unit's claim against Farmers. It is clearly not "coercion" for a creditor to insist upon its legal rights. The only wrongful act of Farmers which I find in the record was its threat to seize the rents on the basis of an assignment which it knew or clearly should have known, was no longer legally viable.[17] That threat, however, neither deprived Unit of free will[18] nor caused its assent to the April 1974 agreement. *Restatement of Contracts*, Second § 175, Comment *c.*

Unit's principal was an experienced, sophisticated businessman and it was represented by experienced counsel in early 1974 Unit knew precisely how to eliminate its concern over this wrongful threat. It knew that prompt judicial relief by way of a restraining order could be secured if its position were meritorious. Indeed, it successfully resorted to such a remedy a few months later when another creditor attempted to seize the rents.

The fact of the matter is that Unit entered the April 1974 agreement, not because of any wrongful threat of rent seizure, but rather because it had managed to get itself in dire financial straits and saw the April agreement as a way out. It entered that agreement voluntarily because of the significant benefits it received under its provisions. This is demonstrated not only by the facts surrounding the April transaction, including Unit's failure to seek judicial relief, but also the subsequent Dayton Group transaction. The latter transaction vividly demonstrates that Unit, in the absence of any wrongful threat of rent seizure, was only too willing to work out its own salvation at the expense of FW.

For these reasons, judgment will be entered for Farmers on this claim.

---

**17.** *Restatement (2d)* § 176(1)(c).

**18.** *See Fowler v. Mumford*, 102 A.2d 535 (Del. Super.1954); *Plechner v. Widener College*, 569 F.2d 1250, 1260 (3rd Cir. 1977). 13 *Williston,* § 1603 (3d ed. 1970) at 658. *But see Restatement (2d), Contracts*, § 175, Comment *a,* which rests voidability on the absence of any reasonable alternative.

## VI. THE TRUSTEE'S INTEREST CLAIMS.

Prejudgment interest will be awarded on all the Trustee's claims. *See Pack & Process, Inc. v. Nabisco, Inc.*, C.A. No. 78–285 (D.Del. September 18, 1981).