312 S.E.2d 765

**Carroll R. McGINNIS, et al.**

v.

**D.B. CAYTON, et al., etc.**

**No. 15658.**

Supreme Court of Appeals of
West Virginia.

Jan. 27, 1984.

Concurring Opinion Feb. 14, 1984.

David G. Hanlon, Harrisville, for appellants.

No appearance for appellees.

NEELY, Justice.

The appellants, Carroll and Emma McGinnis, are the owners of a 47 acre tract of land in Ritchie County. In April of 1893 their predecessors in interest granted an oil and gas lease on that property to George H. Ahrens. The lease gave the lessee a five-year primary term and a potentially perpetual renewal predicated on the continued production of oil or gas. In consideration for the right to produce the oil on the property, the lessee agreed to pay the lessor a one-eighth royalty. The lease further provided that if sufficient gas were produced to justify marketing, the lessor would be paid $100 per year for so long as the well produced gas.

Appellants claim that for more than twenty-five years prior to 1978 no gas was produced on the leasehold and the lease was maintained through the production of oil from a single well. In 1978 an old gas well was deepened. In 1979 the appellants wrote the lessees and demanded a one-eighth royalty in all gas production. Instead they were sent a check for $100 pursuant to the original lease.

Appellants went to the Circuit Court in Ritchie County and asked that the original lease be reformed or voided. More specifically, they argued that the clause providing that the payment of $100 for the right to

produce all of the gas on the property was no longer commercially reasonable. The appellees moved to dismiss the action on the grounds that it failed to state a claim upon which relief could be granted. By an order entered on 8 December 1981, the court sustained that motion. We granted an appeal and now reverse.

I

This case arises from a trial court's decision to uphold a motion for summary judgment. It is the long-standing policy of the courts of West Virginia to favor resolution of disputes on the merits. In Syl. Pt. 2 of *Sticklen v. Kittle*, 168 W.Va. 147, 287 S.E.2d 148 (1981), we held:

> The trial court, in appraising the sufficiency of a complaint on a Rule 12(b)(6) motion, should not dismiss the complaint unless it appears beyond doubt the plaintiff can prove no set of facts in support of his claims which would entitle him to relief.[1]

When a court is considering a motion to dismiss, the complaint must be construed in the light most favorable to the plaintiff, and its allegations should be considered as true. *John W. Lodge Distributing Co. v. Texaco*, 161 W.Va. 603, 245 S.E.2d 157 (1978). The plaintiff's burden in resisting a motion to dismiss, then, is a light one. *Williams v. Wheeling Steel Corp.*, 266 F.Supp. 651 (N.D.W.Va.1967).

A trial court's denial of a motion for summary judgment, or an appellate court's decision to overturn the granting of such a motion, does not reflect an opinion on the ultimate merits of the case. A court should not dismiss a case simply because it believes it is unlikely that the plaintiff will prevail. *Mandolidis v. Elkins Industries, Inc.*, 161 W.Va. 695, 246 S.E.2d 907, 920 (1978). The final verdict in a case should be the result of the proof offered by the parties and not simply a reflection of their skill in drafting pleadings. *See Wright &*

---

1. Rule 12(b) states in pertinent part:
 Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if

one is required, except that the following defenses may at the option of the pleader be made by motion: ... (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, ....

*Miller, Federal Practice and Procedure: Civil* § 1216 (1969).

 Therefore, our task in the case at hand is not to decide whether the appellants have a strong case, but rather whether they have any case. If there is a plausible reading of the facts that gives rise to a colorable legal argument, the appellants have met their burden in resisting a motion to dismiss for failure to state a claim upon which relief can be granted. An argument that seems tenuous when first advanced may gain credibility as testimony and documentation are offered. Although courts cannot afford to entertain frivolous claims, they must give litigants an opportunity to flesh out plausible arguments. It is with such a disposition that we turn to the facts and possible legal theories available to appellants in this case.

## II

The lease that is currently in force regarding the real property in Ritchie County was drafted in 1893. Since that time, there have been substantial changes in the technology of gas production, the economics of marketing it and the care with which legal documents relating to such production are drafted. At the time this lease was drafted, most drilling operations were primarily for oil. Gas wells were left uncontrolled to discharge into the air because profitable uses for natural gas were only then being discovered. *See Donley, The Law of Coal, Oil and Gas in West Virginia and Virginia,* 436 (1951). It is therefore not surprising that the standard legal form for a mineral lease at that time provided for a small lump-sum payment when natural gas was extracted. It is equally unsurprising to learn: "In modern leases it is frequently provided that gas shall be on a royalty basis, which, of course, is usually more profitable to the lessor." *Donley, supra* at 219.

 The rights and duties of the parties to a contract are controlled by the law in effect at the time the contract was executed. *Gazale v. Gazale,* 219 Va. 775, 250 S.E.2d 365 (1979). Because all of the general legal principles affecting contracts at the time a particular agreement is entered into form a part of that contract as fully as if they were specifically expressed within it, *Huntington Water Corporation v. City of Huntington,* 115 W.Va. 531, 177 S.E. 290 (1935), it is useful to look at analogous cases which were decided at the time the appellant's predecessors in interest entered into the lease.

The case of *Bluestone Coal Co. v. Bell,* 38 W.Va. 297, 18 S.E. 493 (1893), is particularly instructive. In that case, which was decided in the year in which the lease we consider was drafted, this court rescinded a 99-year lease which gave the lessee the right to mine coal and cut timber. The court determined that the primary purpose of the agreement was to give the lessee the right to mine coal. The price for the timber was artifically low because the lessor anticipated considerable profits from his royalties on the coal. In fact, there was not sufficient coal to make mining profitable; but the timber on the property had considerable value and could be marketed profitably. The court stated: "In the absence of the coal, the evidence shows there would have been no contract for the timber. This was the foundation on which the timber contract rested, and the foundation having no real existence, the superstructure must fall." *Id.,* 38 W.Va. at 307, 18 S.E. at 496.

 The legal hook on which the court hung its result in *Bluestone Coal* was the doctrine of mutual mistake. *See* Syl. Pt. 3. This principle provides that a contract is reformable or voidable if it can be shown that the parties mutually erred about a basic fact that is material to their agreement. *Bluestone Coal* can be distinguished from the case *sub judice.* In *Bluestone,* the mistake concerned the existence of an objective fact—presence of coal on the property leased. In the case at hand, the parties agreed to provisions concerning both oil and natural gas and both resources were present. Nevertheless, the limited awareness of the economic value of natural gas at the time when the contract was drafted raises at least the possibility that both parties were operating under the assumption that the value of gas would

remain *de minimis.* Their agreement, then, could be seen as one primarily concerned with oil production just as the *Bluestone* court found that the focus of the agreement in that case was coal.

A *mutual* mistake as to a material assumption which underlies a contractual agreement is sufficient grounds to find that agreement void. The *Restatement (Second) of Contracts* specifically provides in § 152(1):

> Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has the material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake....

Once again, we do not state that a mutual mistake was present in this case. Although it may be true that the production of oil was the primary purpose of the lease in question, it is also plausible that the lessee was aware of the burgeoning market for natural gas and struck a very advantageous bargain.[2] It is also arguable that the original lessor bore the risk of a rise in the value of natural gas by accepting a fixed price for the production of it on his land.

Although appellants are entitled to a hearing, to prevail they must establish mutual mistake as a legally sufficient ground for recision or reformation of the contract. It is true that in *Bluestone Coal, supra* we stated that, "Nothing is more clear than the doctrine that a contract founded in a mutual mistake of the facts constituting the very basis or essence of it will avoid it." *Id.,* 38 W.Va. at 308, 18 S.E. at 496–97. Nevertheless, this Court has not had occasion to address the mutual mistake question in some time, and we note that the doctrine has been applied in disparate ways in other jurisdictions.

Many modern courts have continued to hold that a mutual mistake as to a material fact renders a contract void, *see e.g., Hoffa*

*v. Fitzsimmons,* 499 F.Supp. 357 (D.D.C. 1980); *Tarrant v. Monson,* 96 Nev. 844, 619 P.2d 1210 (1980); *Brauer v. Central Trust Co.,* 433 N.Y.S.2d 304, 77 A.D.2d 239 (1980); *Harper v. McCoy,* 276 S.C. 170, 276 S.E.2d 782 (1981), but also note that some courts have limited the contexts in which they will allow parties to argue that mutual mistake existed. For example, some courts have held that the doctrine of mutual mistake is available only when the parties were mistaken as to facts existing at the time the contract was entered into. *See e.g., Aluminum Co. of America v. Essex Group Inc.,* 499 F.Supp. 53 (D.Pa.1980); *Raphael v. Booth Memorial Hospital,* 412 N.Y.S.2d 409, 67 A.D.2d 702 (1979). Another court has held that the test in cases of mutual mistake is whether the parties would have entered into the contract if they had not been mutually mistaken. *Vermette v. Andersen,* 16 Wash.App. 466, 558 P.2d 258 (1976).

These limitations are highly relevant to the case *sub judice* because the parties in this case are not the original parties in interest but subsequent purchasers for value who had notice of the original contract. The appellants must prove both that the mistake was mutual and that it was material in order to make the contract void as a matter of law. They are estopped from relying on equitable principles because they are not the original parties to the contract, but entered into a deal when the value of natural gas was known. We have recently held:

> A party cannot avoid the legal consequences of his actions on the ground of mistake, even a mistake of fact, where such mistake is the result of negligence on the part of the complaining party.

Syl. Pt. 4, *Webb v. Webb,* 171 W.Va. 614, 301 S.E.2d 570 (1983). Furthermore, the petitioners have allowed the contract to stand unchallenged for some time. "A court of equity has always refused its aid to stale demands where the party slept upon his rights and acquiesced for a great

---

**2.** It was, after all, during the 1890's that natural gas began to be used in the manufacture of

glass. *Donley, supra* at 436.

length of time.... *Hoffman v. Wheeling Savings and Loan Association,* 133 W.Va. 694, 57 S.E.2d 725, 732 (1950) (quoting Lord Camden).

 Given the procedural posture of this case, it would be premature for us to attempt a definitive statement on the doctrine of mutual mistake. We content ourselves with ruling that appellant's allegations raise a potentially meritorious argument, and, therefore, overcome a motion for summary judgment. There is simply not a sufficient factual record to make a definitive interpretation about the purpose and nature of the original lease agreement. It is the function of trials to establish such a record, and to provide an adequate basis for making a fair legal determination of the nature of the parties' agreement. In this regard, of course, it must be remembered that the lease enjoys a presumption of validity and the plaintiffs must prove by a preponderance of the evidence that there was, indeed, a mutual mistake of fact and that the contract did not allocate the risk of changed conditions.

 We also note that appellants allege that lessees abandoned the leasehold because they did not pay gas royalties for more than twenty-five years and did not pay oil royalties for three years. Because we must accept these allegations as true for purposes of a motion for summary judgment, appellant is certainly entitled to a trial on this issue. Once again, we do not opine that there was abandonment here. Appellants must prove their factual allegations and demonstrate that they constitute abandonment under the terms of the contract and the laws of West Virginia. We rule only that they have a right to raise the issue at trial.

Accordingly, the judgment of the Circuit Court is reversed and the case is remanded for further proceedings consistent with this opinion.

Reversed.

HARSHBARGER, Justice, concurring:

I concur in the majority result but not in its limited scope. The opinion works an injustice "in the name of the law," ignores equitable principles, and hurts hundreds of West Virginia landowners.

Research and experience teach that the McGinnis lease's type of royalty provision—a fractional interest in oil production and a flat rate payment per gas well—was typical in old oil and gas leases.[1] *See,* for example, excerpted lease provisions in *Lovett v. Eastern Oil Co.,* 68 W.Va. 667, 70 S.E. 707 (1911), and *South Penn Oil Co. v. Snodgrass,* 71 W.Va. 438, 76 S.E. 961 (1931). *See generally,* Donley, *The Law of Coal, Oil and Gas in West Virginia and Virginia,* § 156.[2]

Oil and gas leases in the second half of the nineteenth century in West Virginia primarily promoted oil production. Gas was secondary and mostly an adjunct or a by-product. Ambler and Summers, in their history, *West Virginia, The Mountain State* (Prentice-Hall, New Jersey, 1958), pp. 433–437, wrote about the avid search for oil in Ritchie County in 1859. Shallow wells were producing until about 1889 when new, deeper borings brought in "gushers". "[S]oon other prospectors, mostly New Yorkers and Pennsylvanians, joined resourceful natives in search of oil leases. Except in the immediate vicinity of a gusher, these leases cost little and were taken with a view to their sale to *bona fide* operators." *Id.,* at 434.

These authors recognized that "[u]ntil the 1890's, when natural gas first began to

---

1. The uniformity of royalty provisions in leases might suggest standardized contracts, the terms of which were not subject to bargaining. *See* discussion, *infra,* on unconscionability, and Dugan, *The Application of Substantive Unconscionability to Standardized Contracts—A Systematic Approach,* 18 New Eng.L.Rev. 77 (1982).

2. Donley, *The Law of Coal, Oil and Gas in West Virginia and Virginia,* § 156, p. 219 (1951):

"In the older oil and gas leases, the oil royalty was almost universally one-eighth of the oil produced, without deduction of any cost of production or marketing, but gas was placed upon a "flat well rental" basis, the lessor to receive a lump sum annually for each producing well, irrespective of the amount of gas produced. In modern leases, it is frequently provided that gas shall be on a royalty basis, which, of course, is usually more profitable to the lessor."

be used in a large way for the manufacture of glassware, drilling operations were primarily for oil. Unwelcomed gas flows were left uncontrolled for months to discharge into the air." *Id.*, at 436. They mentioned that our State's most famous ignited gas flow, a giant flambeau called "Big Moses" located in Tyler County (contiguous to Ritchie), was drilled in September, 1894 and left to burn for more than a year.

Therefore, historically, in West Virginia in 1893 when this lease was executed, natural gas was an incidental result of drilling efforts, and oil was the sought-after mineral.[3] Professor Donley also recognized that after natural gas began to become a valuable resource, royalty provisions were altered: "In modern leases, it is frequently provided that gas shall be on a royalty basis, which, of course, is usually more profitable to the lessor." *The Law of Coal, Oil and Gas in West Virginia and Virginia, supra* at 219.

The McGinnises' complaint mixes contract law and equity.[4] Contracts are generally about relatively straightforward exchanges governed by standard, broadly applicable rules.[5] The application of equitable principles such as reformation and specific performance into the predictable contract law structure is rare and discouraged.

The historical development of common law contracts concepts is beyond the scope of this concurrence. But there has been a positive movement away from strict and rigid rules of law in order to accommodate long-term contracts that have become manifestly unfair: evenness and equity should prevail over form, and justice demands

---

**3.** We could judicially notice that the value of natural gas at the wellhead has increased many times since 1893. I sought to discover the average price of natural gas at the wellhead when this lease was written and the average price today. This seemingly simple task snowballed in complexity. These statistics were not maintained. I found in Volume 23 of the *West Virginia Geological Survey*, p. 95, that the total value of gas at point of consumption in West Virginia in 1893 was $123,000. By 1906 that same figure was $13,735,343. In 1906 (there is no figure for 1893), 119,400,392 mcf of natural gas was produced. As difficult as it was to discover historical figures, data on current natural gas prices and production are more obscure. The intervention of federal regulation, the Federal Power Commission's (now Federal Energy Regulatory Commission—FERC) authority to regulate wellhead prices (acknowledged in 1954), division of gas into old and new gas, the effect of the Natural Gas Policy Act on post-1977 gas, individual pricing policies for "stripper gas", and the Independent Oil and Gas Producers Association's (IOGPA) own pricing whittles at the credibility of any one figure to represent an average value of gas at the wellhead, that is the price or value to a lessor for purposes of royalties.

The United States Department of Energy has an Energy Information Administration, Office of Oil and Gas, that publishes annual reports. In the *Natural Gas Annual 1981*, published September, 1982, p. 60, Table B1 records the national average wellhead value of natural gas from 1930 until 1981. Remembering that by 1930 natural gas was fully recognized as a valuable resource for residential, commercial, and industrial energy, it was valued at $0.08/mcf in 1930 and $1.98/mcf in 1981. The same agency publishes the *Natural Gas Monthly.* In the April,

1983 issue, at p. 52, an average wellhead price has been determined monthly for old gas, new gas, high-cost gas, and miscellaneous. This figure represents a national average, but the increase in wellhead prices continues rapidly: the January, 1981 figure of $1.91/mcf blanches against the March, 1983 figure of $2.79/mcf.

Our Public Service Commission publishes an annual report and in its *69th Annual Report Public Service Commission of West Virginia (1981–1982), Book I,* p. 84, it states that 121,157,-905 mcf of natural gas was produced and distributed in West Virginia in the year ending December 31, 1981.

**4.** Gas and oil leases are construed and interpreted by courts in the same general manner as are other contracts. One would be blind to pretend that they are anything but business contracts that tangentially involve aspects of real property law. They are closer to contracts for the sale of goods than typical property leases. In fact, Article 2 of the Uniform Commercial Code on Sales includes Section 107, W.Va.Code, 46–2–107(1):

"A contract for the sale of timber, *minerals* or the like or a structure or its materials to be removed from realty is a contract for the sale of goods within this article if they are to be severed by the seller but until severance a purported present sale thereof which is not effective as a transfer of an interest in land is effective only as a contract to sell." (Emphasis supplied.)

**5.** I am considering the pertinent provisions of this lease as of the time it was made, and there being no proof of adhesive qualities, it was an agreement between two equally knowledgeable contracting parties to benefit their economic positions.

whatever flexibility is necessary to fill in contractual gaps and adapt to unexpected changes.[6]

This progress has brought criticism from those who fear that uncertainty or potential court intervention in contractual relations will emasculate our revered liberty interest in "freedom of contract". That phrase, however, describes a shield, not a sword.

"Freedom of contract" means freedom to agree or assent; not freedom to be forced to agree, to be presumed to have assented, to be cornered into something that one has not remotely considered, or to be denied meaningful choice. This theoretical and philosophical argument underlies the evolution of contract law and this concurrence. "Freedom of contract" does not vindicate tolerance of blatant inequities or unconscionable acts. Our society values fundamental fairness, equality, honesty, cooperation and ethics.

UCC writers and *Restatement* reporters recognized that this balance favored equitable principles, and so do many scholars and authors. (*See* Footnote 6, *supra*.) Neither the UCC nor the *Restatement (Second) of Contracts* (1981) is controlling precedent, but both have provisions relieving against the "you are bound by what you signed" rule. In certain instances, courts now may investigate factors external to the writings, and permit contracts to be avoided, duties to be discharged, or terms reformed for many reasons, *viz.*, mutual mistake, unilateral mistake accompanied by fraud or misrepresentations, super-

vening, unforeseeable events, and unconscionability.

A. Mistake.

The majority discusses mutual mistake as a possible cause of action that would permit plaintiffs to have a trial on the merits.

Mistakes that affect contractual relations are those involving the parties' understanding of the meaning of terms; drafting errors or erroneous expression of the parties' intent (often made by a scrivener); mistakes in the basic assumptions underlying the parties' agreement; and mistakes in performance. The McGinnises may make a *prima facie* case for relief from their lease because their predecessors and the original lessees were wrong in basic assumptions.

An allegation that a contract is reformable or voidable because the parties erred about a basic fact usually requires proof that the error was mutual. I accept Syllabus Point 2 of the majority opinion. It is a restatement of *Restatement (Second) of Contracts*, § 152(1).

If the mistake was unilateral on the lessor's part, and the lessee knew the value of natural gas, the McGinnises would have to meet criteria similar to those in *Restatement (Second) of Contracts*, § 153.[7] *See Lusher v. Sparks*, 146 W.Va. 795, 122 S.E.2d 609 (1961); *Moody v. Smoot Advertising Co.*, 98 W.Va. 261, 126 S.E. 919 (1925); *White v. Kelly*, 85 W.Va. 366, 101 S.E. 724 (1920); *Smith v. Board of Education*, 76 W.Va. 239, 85 S.E. 513 (1915).

**6.** We cite the reader to Ian R. Macneil's book *The New Social Contract: An Inquiry Into Modern Contractual Relations* (1980); C. Fried, *Contract as Promise: A Theory of Contractual Obligations* (1981); Atiyah, *Promises, Morals and Law* (1981); Atiyah, *The Rise and Fall of Freedom of Contract* (1979); Gilmore, *The Death of Contracts* (1974); Macneil, *Contracts: Adjustment of Long-Term Economic Relations Under Classical, Neoclassical, and Relational Contract Law*, 72 Nw.U.L.Rev. 854 (1978); MacNeil, *Values in Contract: Internal and External*, 78 Nw.U. L.Rev. 340 (1983); *Symposium: Jurisprudential Perspectives on Contract*, 17 Valp.U.L.Rev. 613–752 (1983); *Symposium: The Relevance of Contract Theory*, 1967 Wisc.L.Rev. 803–839; Speidel, *Court-Imposed Price Adjustments Under*

*Long-Term Supply Contracts*, 76 Nw.U.L.Rev. 369 (1981).

**7.** "§ 153. When Mistake of One Party Makes a Contract Voidable

"Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in § 154, and

"(a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or

"(b) the other party had reason to know of the mistake or his fault caused the mistake."

However, mistakes that make contracts voidable or reformable must be about existing facts (past or present) when the contract was made and not be simply poor predictions of future events. Syllabus Point 2, *Webb v. Webb,* 171 W.Va. 614, 301 S.E.2d 570 (1983); *Leasco v. Taussig,* 473 F.2d 777 (2d Cir.1972); *George Backer Management v. Acme Quilting Co.,* 46 N.Y.2d 211, 413 N.Y.S.2d 135, 385 N.E.2d 1062 (1978); *Shear v. National Rifle Assn. of America,* 606 F.2d 1251 (D.C.Cir.1979); *Louisiana Power and Light Co. v. Allegheny Ludlum Industry,* 517 F.Supp. 1319 (E.D.La.1981). *See also Restatement (Second) of Contracts,* § 151, *Comment a,* and § 266.[8] Was a mistake about the inherent value of natural gas one about an existing fact, or was it an erroneous prediction of a future event? Did both parties contract based on a mistaken belief? Answers to these questions can only come from a hearing on the merits.

**8.** *Restatement (Second) of Contracts* (1981):
 "§ 266. Existing Impracticability or Frustration
 "(1) Where, at the time a contract is made, a party's performance under it is impracticable without his fault because of a fact of which he has no reason to know and the non-existence of which is a basic assumption on which the contract is made, no duty to render that performance arises, unless the language or circumstances indicate the contrary.
 "(2) Where, at the time a contract is made, a party's principal purpose is substantially frustrated without his fault by a fact of which he has no reason to know and the non-existence of which is a basic assumption on which the contract is made, no duty of that party to render performance arises, unless the language or circumstances indicate the contrary."

**9.** The lessors' abandonment argument, citing *Lowther Oil Co. v. Guffey,* 52 W.Va. 88, 43 S.E. 101 (1902), ought to be heard by the trial court. While it is true that an "or" lease such as this— to continue so long as gas *or* oil is produced— will not be terminated while one of the minerals is being produced, it is arguable that a long-term cessation of production or nonpayment on one of the minerals abandons lessees' rights to that mineral and the contracted royalty provisions. *See Bluestone Coal Co. v. Bell,* 38 W.Va. 297, 18 S.E. 493 (1893). This argument deserves further study and research because there has been no factual development about when and what royalties were paid or when and which minerals were produced or sold. The gas and oil provisions in this lease are separate, indicating that each was to be treated separately, *Sun Oil Co. (Delaware) v. Madeley,* 626 S.W.2d 726

*Bluestone Coal Co. v. Bell,* 38 W.Va. 297, 18 S.E. 493 (1893), cited by the majority, is a useful precedent. I also recognize that *Bluestone's* analyses emphasized abandonment and laches concepts. Those arguments may be useful to the McGinnises.[9]

## B. Supervening, Unforeseeable Event.

### 1. Commercial Impracticability.

The difficulties of proof of mistake may be insurmountable, considering that if it occurred, it occurred nearly a century ago. But, it is here that one can connect rules about mistake in making a contract with those about uncontemplated supervening events that destroy or frustrate its commercial purposes.[10]

Commercial impracticability law has evolved from older contract excuses from performance called impossibility and frustration of purpose.[11] They may be raised

(Tex.1981), *reh. denied,* and production of one might not prevent abandonment of rights to the other. *Cf., Goodwin v. Wright,* 163 W.Va. 264, 255 S.E.2d 924 (1979).

**10.** *See generally Restatement (Second) of Contracts* (1981):
 "§ 261. Discharge by Supervening Impracticability
 "Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary."
 "§ 265. Discharge by Supervening Frustration
 "Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary."

**11.** These doctrines originated in English common law, and are most frequently attributed to *Paradine v. Jane,* 82 Eng.Rep. 897 (K.B.1647) and *Krell v. Henry* (1903) 2 K.B. 740. The law slowly moved from a rule of absolute contractual liability to a "rule of discharge". *See* Hurst, *Freedom of Contract In An Unstable Economy: Judicial Reallocation of Contractual Risks Under UCC Section 2-615,* 54 N.C.Law Rev. 545 (1975–

when contracts have been affected by supervening events, such as war, embargo, crop failure, shutdowns of supply sources. Comment 4 to Uniform Commercial Code, § 2–615, W.Va.Code, 46–2–615 (1963); [12] *Restatement (Second) of Contracts,* §§ 261 and 265, *supra. See* Wallach, *The Excuse Defense in the Law of Contracts: Judicial Frustration of the U.C.C. Attempt to Liberalize the Law of Commercial Impracticability,* 55 Notre Dame Law. 203 (1979); Black, *Sales Contracts and Impracticability In A Changing World,* 13 St. Mary's L.J. 247 (1981).

This contract-escape route requires a disadvantaged party to show that he was not at fault, that the supervening event was not reasonably foreseeable, that neither party had assumed or allocated that risk, and that the loss would be so severe and create such hardship that performance would be commercially impractical. *Transatlantic Financing Corp. v. United States,* 363 F.2d 312 (D.C.Cir.1966); *Publicker Industries, Inc. v. Union Carbide,* 17 U.C.C.Rep.Serv. 989 (E.D.Pa.1975); *Eastern Air Lines v. Gulf Oil Co.,* 415 F.Supp. 429 (S.D.Fla.1975).

The court in *Transatlantic Financing* found that excess expenses of shipping wheat around the Cape of Good Hope, rather than through the Suez Canal (planned when this contract was made, but prevented by a post-contract/pre-delivery Egyptian blockade) were not severe enough to constitute commercial impracticability. Also, in *Publicker Industries,* OPEC's huge oil price increases were no excuse for Union Carbide to avoid performance of its ethanol contract because the court devined that the Middle East oil situation had been foreseeable.

So, the commercial impracticability doctrine is recognized, but rarely allowed as an excuse for nonperformance. *Transatlantic Financing Corp. v. United States, supra; Publicker Industries, Inc. v. Union Carbide, supra; Eastern Air Lines v. Gulf Oil Co., supra; Missouri Public Service Co. v. Peabody Coal Co.,* 583 S.W.2d 721 (W.D.Mo.App.), *cert. denied,* 444 U.S. 865, 100 S.Ct. 135, 62 L.Ed.2d 88 (1979); *Maple Farms, Inc. v. City School District,* 76 Misc.2d 1080, 352 N.Y.S.2d 784 (Sup.Ct. 1974); *Iowa Electric Light and Power Co. v. Atlas Corp.,* 467 F.Supp. 129 (N.D.Iowa 1978). *Contra, Aluminum Co. of America v. Essex Group, Inc.,* 499 F.Supp. 53 (W.D.Pa.1980) (*Alcoa*), discussed *infra. See generally* Sirianni, *The Developing*

---

76). Frustration of purpose, impossibility and commercial impracticability combine to illustrate a doctrine that protects parties from the effects of uncontemplated, unallocated supervening events. While each separate category may have its own definition, they are sufficiently similar to be put in one class.

**12.** W.Va.Code, 46–2–615:

"Except so far as a seller may have assumed a greater obligation and subject to the preceding section [§ 46–2–614] on substituted performance:

"(a) Delay in delivery or nondelivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of his duty under a contract for sale if performance as agreed has been made impractical by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid.

"(b) Where the causes mentioned in paragraph (a) affect only a part of the seller's capacity to perform, he must allocate production and deliveries among his customers but may at his option include regular customers not then under contract as well as his own requirements for further manufacture. He may so allocate in any manner which is fair and reasonable.

"(c) The seller must notify the buyer seasonably that there will be delay or nondelivery and, when allocation is required under paragraph (b), of the estimated quota thus made available for the buyer."

*Official Comment 4:*

"Increased cost alone does not excuse performance unless the rise in cost is due to some unforeseen contingency which alters the essential nature of the performance. Neither is a rise or a collapse in the market in itself a justification, for that is exactly the type of business risk which business contracts made at fixed prices are intended to cover. But a severe shortage of raw materials or of supplies due to a contingency such as war, embargo, local crop failure, unforeseen shutdown of major sources of supply or the like, which either causes a marked increase in cost or altogether prevents the seller from securing supplies necessary to his performance, is within the contemplation of this section. [Citation omitted.]"

*Law of Contractual Impracticability and Impossibility: Parts I and II,* 14 U.C.C. L.J. 30 and 146 (1981–82); Comment (Hubbard), *Relief From Burdensome Long-Term Contracts: Commercial Impracticability, Frustration of Purpose, Mutual Mistake of Fact, and Equitable Adjustment,* 47 Mo.L.Rev. 79 (1982); Jacobs, *Legal Realism or Legal Fiction? Impracticability Under the Restatement (Second) of Contracts,* 87 Commercial L.J. 289 (1982); Macneil, *Contracts: Adjustment of Long-Term Economic Relations Under Classical, Neoclassical, and Relational Contract Law,* 72 Nw.U.L.Rev. 854 (1978); Black, *supra;* Trakman, *Frustrated Contracts and Legal Fictions,* 46 Modern L.Rev. 39 (1983).[13]

### 2. Supervening Events Causing Unjust Enrichment.

If the increased utility of and the concomitant advances in technology to capture and produce natural gas were unpredictable, supervening events working to undermine the purpose of the contract (for lessor and lessee to reap fair and equitable benefits from the extraction and sale of valuable minerals on the leased tract), discharge from performance is not the only possible remedy. The contract may be reformed, duties may be enhanced, or restitution ordered for unjust enrichment.

In 1912 our Court discussed supervening factors, such as change in value of natural resources over extensive time periods, and their effect on contracts. In *Buffalo Coal & Coke Co. v. Vance,* 71 W.Va. 148, 76 S.E. 177 (1912), we refused to grant specific performance of a *five-year-old* executory contract to lease minerals. The Court used equitable principles to evaluate what was

fair and just. At page 152 of 71 W.Va., 76 S.E., at 179, the Court stated:

> True there is no evidence in the case showing what changes in value have taken place since the date of the contract, *but we may take judicial notice that the value of all mineral and timber land in this state had greatly enhanced in value within the five years* intervening between the date of the contract and the date of the suit. We think we may assume from the facts established in the cause that some object of advantage to the plaintiff and disadvantage to the defendant called the plaintiff to action after nearly five years of unexplained delay.[14] (Emphasis supplied.)

Equities are as important in suits seeking reformation or rescission as in actions for specific performance such as *Buffalo Coal & Coke Co.*[15] The logic behind the court's refusal to enforce the *Buffalo* contract may well apply to the McGinnises' lease. The court would not permit appellees to "reap where they have not sown" to the disadvantage and injury of the other party. *Id.,* 71 W.Va. at 155, 76 S.E.2d at 180. Equity protects against a party who, through inactivity and the passage of time during which values and technology have changed, gains an advantage over an innocent other party. *See also Crawford v. Workman,* 64 W.Va. 10, 61 S.E. 319 (1908). *Buffalo Coal & Coke, supra,* had this Syllabus Point:

> Specific performance is not a matter of right, but lies in the sound discretion of the court, and will not be exercised in favor of one who has slept on his rights, *or the circumstances and conditions have so changed that specific perform-*

**13.** Wallach, *supra* 55 Notre Dame Law., at 229, challenges courts to freely apply the doctrine in price adjustment cases. The reluctance of courts to discharge an obligation by excuse is reduced by the alternative remedy of equitable price adjustment, and application of the doctrine is much more palatable. It accords with his perception of the drafters' intents in the Uniform Commercial Code and *Restatement.*

**14.** *See also Wellman v. Virginia Railway Co.,* 85 W.Va. 169, 101 S.E. 252, 253 (1919): "Years have brought changes of circumstances and of

parties. Timber then of little value has now become of great value, of which we may take judicial notice."

**15.** I reject the argument that use of equitable principles to refuse to order specific performance is different in substance from use of the same equitable principles to avoid consequences of unconscionable or uncontemplated effects of a contract. *Contra,* Leff, *Unconscionability and The Code—The Emperor's New Clause,* 115 U.Pa. L.Rev. 485 at 528 *et seq.* (1967).

*ance would result in hardship.* (Emphasis supplied.) Syllabus Point 3.

C. Unconscionability.

The equitable concept of unconscionability has long been applied to contract law. In 1889 Chief Justice Fuller of the United States Supreme Court quoted *Earl of Chesterfield v. Janssen,* 2 Ves.Sen. 125, 155, 28 Eng.Rep. 82, 100 (Ch. 1750), in defining what constitutes unconscionability that requires court intervention:

> It may be apparent from the intrinsic nature and subject of the bargain itself; such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other; which are unequitable and unconscientious bargains....

*Hume v. United States,* 132 U.S. 406, 411, 10 S.Ct. 134, 136, 33 L.Ed. 393 (1889).

Unconscionability means overall and gross imbalance, one-sidedness or lop-sidedness that justifies a court's refusal to enforce a contract as written. *See Campbell Soup Co. v. Wentz,* 172 F.2d 80, 84 (3d Cir.1948) ("the sum total of its provisions drives too hard a bargain for a court of conscience to assist"). *See generally,* S. Deutch, *Unfair Contracts* (1977); Leff, *Unconscionability and The Code—The Emperor's New Clause,* 115 U.Pa.L.Rev. 485 (1967); Spanogle, *Analyzing Unconscionability Problems,* 117 U.Pa.L.Rev. 931 (1968–69); Ellinghaus, *In Defense of Unconscionability,* 78 Yale L.J. 757 (1968–69); Murray, *Unconscionability: Unconscionability,* 31 U.Pitt.L.Rev. 1 (1969); Dugan, *The Application of Substantive Un-*

*conscionability to Standardized Contracts—A Systematic Approach,* 18 New Eng.L.Rev. 77 (1982). While unconscionability was initially introduced into contract law through equity, it has been codified in the Uniform Commercial Code § 2–302,[16] 2–309(3), and 2–719(3), W.Va.Code, Chapter 46, Article 2, and in *Restatement (Second) of Contracts* (1981), § 208.[17]

Dean John Murray, an influential writer and professor of contracts, has spent considerable energy analyzing the doctrine of unconscionability, trying to create workable rules for courts to apply. Murray, *Unconscionability: Unconscionability,* 31 U.Pitt.L.Rev. 1–80 (1969); Murray, *Section 2–207 of the Uniform Commercial Code: Another Word About Incipient Unconscionability,* 39 U.Pitt.L.Rev. 597 (1978); *Roundtable Discussion of Unconscionability, Etcetera,* 31 U.Pitt.L.Rev. 547–585 (1970); *see generally,* Murray *on Contracts* (rev. ed., 1974). His three-step analysis of unconscionability derives primarily from contract law rather than equity. Risks that have been allocated by the parties—expected or at least not unexpected—are not usually unconscionable. If the risk allocation was inconspicuous or if there was no allocation because the risk was unexpected, the contract may be unconscionable if the risk was material. If the risk was unexpected but was immaterial, a contract affected by it is not unconscionable, according to Professor Murray. If unexpected and material, or if material and specifically allocated but not bargained for, the contract may be unconscionable. The McGinnis case does not reach the lat-

---

**16.** Uniform Commercial Code, W.Va.Code, 46–2–302:

"Unconscionable contract or clause.

"(1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable *at the time it was made* [see text, *infra* ] the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result." (Emphasis supplied.)

"(2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be af-

forded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination."

**17.** *Restatement (Second) of Contracts* (1981), § 208:

"Unconscionable Contract or Term

"If a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result."

ter stages of Murray's analysis because the surrounding circumstances of the contract (historical facts of oil and gas leases in West Virginia in late 1800's) indicate that the risk of natural gas becoming a highly marketable resource that would, in and of itself, motivate drilling, was not remotely in either party's contemplation. It was not within the "circle of assent".

Professor Leff, in his analysis of unconscionability in Article 2 of the U.C.C., *Unconscionability and the Code—The Emperor's New Clause*, 115 U.Pa.L.Rev. 485 (1967), divides unconscionability into two classes. Procedural unconscionability involves inequities and unfairness in the bargaining process ("bargaining naughtiness"); and substantive unconscionability means unfairness in the contract itself—overall imbalance, one-sidedness, *laesio enormis* [18], and "the evils of the resulting contract." These ideas were further explained by Deutch, *supra* 119 *et seq*. He finds procedural unconscionability in contracts of adhesion when there is an imbalance in bargaining power, absence of meaningful choice, unfair surprise, or sharp or deceptive practices (fine print, legalese disclaimers, or boilerplate clauses on the back of contracts, for examples). Here there are no facts showing procedural unconscionability by either Leff's or Deutch's tests; but substantive unconscionability, resulting from changes in technology and the value of the resource, is obvious.

This Court has found contracts to be unconscionable. *E.g., Ashland Oil, Inc. v. Donahue*, 159 W.Va. 463, 223 S.E.2d 433 (1976). Unconscionability cannot be in the abstract, Syllabus Point 2, *McMellon v. Adkins*, 171 W.Va. 475, 300 S.E.2d 116 (1983); *Hill v. Joseph T. Ryerson, Inc.*, 165 W.Va. 22, 268 S.E.2d 296, 306 (1980), and is usually evaluated as of the time a contract is written, but not always. While the strict language of the *Restatement* and Uniform Commercial Code unconscionability provi-

sions are about unconscionability when the contract was made, I use those provisions as a starting point for my analysis and not as a constraint. In this everchanging world one must be sensitive to the need to evolve rules to fit changed circumstances.[19]

This Court has mentioned mineral lease clauses that might be unconscionable. In *Lowther Oil Co. v. Guffey*, 52 W.Va. 88, 43 S.E. 101 (1902), we enforced the lease challenged by the lessors, but noted 52 W.Va., at 91, 43 S.E., at 102:

The manacles were forged by the lessors themselves with their eyes open, and the court cannot remove them unless fraud can be shown *or the contract is so unfair and uneven as to render its enforcement equivalent to the perpetration of fraud upon the lessors.* (Emphasis supplied.)

Justice Neely quoted this portion of Judge Dent's opinion from *Lowther* in *Iafolla v. Douglas Pocahontas Coal Corp.*, 162 W.Va. 489, 250 S.E.2d 128, 133 (1978), *reh. denied*, and then stated:

We can envisage a situation in which a contract of this nature might, *by virtue of changed circumstances unforeseen by either of the contracting parties* become so "unfair and uneven as to render its enforcement equivalent to the perpetration of fraud upon the lessors". (Footnote omitted; emphasis supplied.)

*Iafolla* was not that case. This should be. Justice Neely ignored his own premonition when he authored this majority opinion. Perhaps he has changed his mind about equity and fairness, and has with the majority joined those who use sanctity of contract to do injustice.

Unconscionability is a further development of the requirement of good faith in bargaining. Professor Summers described the role of equitable principles in the Uniform Commercial Code, § 1–103,[20] and his comments are pertinent here:

---

**18.** *See Corbin on Contracts* (1982 Supp., Kaufman) § 597C, p. 588.

**19.** Justice Neely articulated this consciousness in *State ex rel. Knight v. Public Service Commission*, 161 W.Va. 447, 245 S.E.2d 144, 148 (1978),

when he wrote that "old West Virginia cases should not, in and of themselves, unduly terrorize modern litigants with contemporary problems unforeseen by our predecessors."

**20.** Uniform Commercial Code, § 1–103:

The general practice of deciding cases not only in light of specific code provisions but also in light of any transactional and relational equities not displaced by specific code sections enables judges to do equity as between the parties, when appropriate. Yet it does not force them to bend or fictionalize the rules. It also rationally allocates decisional responsibility in accord with a comparative advantage of judges over legislators ....[21]

*General Equitable Principles Under Section 1-103 of the Uniform Commercial Code,* 72 Nw.U.L.Rev. 906, 912 (1978).

He also quite appropriately states at p. 925:

[M]any general equitable principles generate reasons that depend for their justificatory force on prior *culpable* behavior of a party .... However, it is also true that some reasons generated by general equitable principles derive their force not from culpability factors, but from "fairness" factors. Fairness reasons derive their force from the fairness or unfairness of leaving the parties "as is" in light of an equitable principle such as estoppel, comparative diligence, unforeseen frustration of expectancy, or unjust enrichment [and we add unconscionability].

Unconscionability can arise at a later date: even though a bargain was not unconscionable when made, it may become so, because leaving the parties as they were is unpalatably unfair. If one accepts Professor Leff's divisions of unconscionability into procedural and substantive aspects, it seems that unconscionability at the time a contract is made is the correct test for procedural problems within the bargaining process, but substantive unconscionability (overall and gross imbalance, oppression, or unfairness) can be raised at any time during the life of the contract.

### D. Solutions.

Situations arising from contracts like the McGinnises' recommend solutions by inter-party renegotiation. When that does not work, courts should make themselves available to provide just and equitable resolutions with the primary goal being to maintain the integrity of the long-term contractual relationship. *See* Macneil articles, *supra;* Speidel, *supra.* This can be better achieved by remedies such as equitable adjustment than rescission or discharge from performance.

Equitable adjustment is an evolved form of "reformation". It can be used to prevent or remedy unjust enrichment, unconscionability or other inequities. It has received considerable scholarly support. Wallach, *supra* at 228–229; Macneil, *supra;* Speidel, *Court-Imposed Price Adjustments Under Long-Term Supply Contracts,* 76 Nw.U.L.Rev. 369; Comment (Hubbard), 47 Mo.L.Rev. at 104; Trakman, *supra;* Ellinghaus, *supra* 78 Yale L.J. at 791; Fuller and Perdue, *The Reliance Interest in Contract Damages: II,* 46 Yale L.J. 373, 379–382 (1937); Mueller, *Contract Remedies: Business Fact and Legal Fantasy,* 1967 Wis.L.Rev. 833, 836–837; Comment, *Loss Splitting in Contract Litigation,* 18 U.Chi.L.Rev. 153, 154–156 (1950); Comment, *Apportioning Loss After Discharge of a Burdensome Contract: A Statutory Solution,* 69 Yale L.J. 1054, 1059–1060 (1950). It is suggested in com-

"Unless displaced by the particular provisions of this chapter, the principles of law and *equity,* including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions." (Emphasis supplied.) *See also* Uniform Commercial Code, W.Va.Code, 46–1–203 (1963): "Every contract or duty within this chapter imposes an obligation of good faith in its performance or enforcement."
*See also* Hillman, *Construction of the Uniform Commercial Code: U.C.C. Section 1–103 and*

*"Code" Methodology,* 18 Boston College Industrial and Commercial Law Review 655 (1977).

**21.** Professors Leff and Speidel would disagree, at least so far as consumer contracts are concerned. They believe the better route is to permit a legislature to announce specific prohibitions. Leff, *supra* 115 U.Pa.L.Rev. 485; Leff, *Unconscionability and the Crowd—Consumer and the Common Law Tradition,* 31 U.Pitt.L. Rev. 349 (1969–70); Speidel, *Unconscionability, Assent and Consumer Protection,* 31 U.Pitt.L. Rev. 359 (1969–70).

ment 6 of Section 2–615 of the Uniform Commercial Code,[22] and appears available in *Restatement (Second)* § 152(2),[23] comment c (suggesting flexibility of relief through reformation, restitution or otherwise), § 158(2)[24] and § 272(2)[25] (encouraging play with appropriate remedies to bring about justice in cases of mistake, commercial impracticability and frustration of purpose).

I found one case in which a court suggested a combination of specific performance and equitable contract adjustment, *La Follette v. La Follette Water, Light and Telephone Co.*, 252 F. 762, 772–773 (6th Cir.1918); one approving an arbitration decision that implied or construed terms to readjust the price, *Mobil Oil Indonesia v. Asamera Oil*, 487 F.Supp. 63 (S.D.N.Y. 1980); and one wherein a court simply readjusted a price figure in a long-term contract, *Aluminum Co. of America v. Essex Group, Inc.*, 499 F.Supp. 53 (W.D.Pa.1980). In *Alcoa*, a district court case that was settled before an appellate court ever wrote about it, Alcoa had contracted with the Essex group to smelt alumina (provided by Essex) into aluminum and sell it back to

Essex. Their contract contained a price escalation figure keyed to the wholesale price index-industrial commodities (WPI-IC). Alcoa wanted reformation when the WPI–IC no longer closely reflected its escalation in non-labor costs and it began to lose a great deal of money, with prospects of greater losses, on the long-term contract. Mixing rules about mistake, frustration of purpose and impracticability, the district court adjusted the price part of the contract. The court's rationale is useful when applied to a contract such as the McGinnises'.

*Alcoa* has not been cited as precedent for what it did, and was distinguished in *Haas v. Pittsburgh National Bank*, 495 F.Supp. 815 (W.D.Pa.1980), in the same district court a few months later. The court refused to alter passbook interest rates to the prime rate in a settlement agreement, despite a huge disparity in rates and significant financial loss to the plaintiffs. The *Haas* opinion emphasized that the settlement was fairly negotiated by competent, knowledgeable counsel and was the result of an erroneous prediction of future events, not a "mutual mistake" of fact.[26] *Alcoa*

**22.** Uniform Commercial Code, W.Va.Code, 46–2–615, Comment 6:

"In situations in which neither sense nor justice is served by either answer when the issue is posed in flat terms of "excuse" or "no excuse," adjustment under the various provisions of this Article is necessary, especially the sections on good faith, on insecurity and assurance and on the reading of all provisions in the light of their purposes, and the general policy of this Act to use equitable principles in furtherance of commercial standards and good faith."

**23.** *Restatement (Second) of Contracts* (1981) § 152(2):

"In determining whether the mistake has a material effect on the agreed exchange of performances, account is taken of any relief by way of reformation, restitution, or *otherwise*." (Emphasis supplied.)

**24.** *Restatement (Second) of Contracts* (1981), § 158(2):

"In any case governed by the rules stated in this Chapter, if those rules together with the rules stated in Chapter 16 [Remedies] will not avoid injustice, *the court may grant relief on such terms as justice requires* including protection of the parties' reliance interests." (Emphasis supplied.)

**25.** *Restatement (Second) of Contracts* (1981), § 272(2):

"In any case governed by the rules stated in this Chapter, if those rules together with the rules stated in Chapter 16 [Remedies] will not avoid injustice, *the court may grant relief on such terms as justice requires* including protection of the parties' reliance interests." (Emphasis supplied.)

**26.** It is these meaningless or purely semantic distinctions to reach specified results that often diminishes respect for the law. *See,* by analogy, discussion in *LaRue v. LaRue,* 172 W.Va. 158, at 168, 304 S.E.2d 312, at 321–322 (1983), about whether to overrule, modify or distinguish *Patterson v. Patterson,* 167 W.Va. 1, 277 S.E.2d 709 (1981). An unconscionability resolution may avoid semantic machinations while achieving the commendable goals of preserving the contract's fairness and original equitable balance. *See* Comment 1, Uniform Commercial Code, W.Va.Code, 46–2–302 (in part):

"This section [on unconscionability, see our fn. 18, *supra* ] is intended to make it possible for the courts to police explicitly against the contracts or clauses which they find to be unconscionable. In the past such policing has been accomplished by adverse construction of language, by manipulation of the rules of offer and

was also distinguished in *Freidco of Wilmington, Delaware, Ltd. v. Farmers Bank of State of Delaware*, 529 F.Supp. 822 (D.Del.1981). The court enforced a thirty-five year office space lease contract as written despite the lessors' contention that the ceiling on utility cost escalations was unrealistic in today's market and worked an impossible economic hardship—a commercial impracticability. The presence of an escalation factor or ceiling was interpreted to be an indication that the risk had been consciously allocated and was foreseeable. *Accord, City of Austin v. Cotten*, 509 S.W.2d 554 (Tex.1974); *Publicker Industries, Inc. v. Union Carbide Corp.*, 17 U.C.C.Rep.Serv. 989 (E.D.Pa. 1975); *Eastern Air Lines v. Gulf Oil Corp.*, 415 F.Supp. 429 (S.D.Fla.1975).

But, questions about escalation clauses and ceilings are left for another day. The McGinnises have a long-term, "perpetual" (already ninety-year-old) lease that contains a flat rate for gas well royalties. It would be difficult indeed to find any indication in that lease that prospects of major monetary and technological changes were contemplated, much less allocated.

Long-term contract problems that arise because of fundamental shifts in the balance or equities of the original relationships are best resolved by the parties. Courts should do all they can to encourage settlement and private resolution. Scriveners of new long-term contracts are aware of this need to provide for dispute resolution and equitable adjustment by parties. Young, *Construction and Enforcement of Long-Term Coal Supply Agreements—Coping With Conditions Arising From Foreseeable and Unforseeable Events—Force Majeure and Gross Inequities Clause*, 27A Rocky Mountain Mineral Law Institute 127 (1982); Black, *Sales Contracts and Impracticability In A Chang-*

*ing World*, 13 St. Mary's L.J. 247 (1981); Speidel, *supra* 76 Nw.U.L.Rev. 369. Professor Speidel even suggests the creation of a duty to negotiate an adjustment in good faith.

However, in the event that a court must intervene, it should only be limited by its perception of fairness.

"Equity, in rescinding contracts, does not confine itself to cases of fraud; cases of plain mistake or missapprehension [sic] of right, though not the effect of fraud or contrivance, are likewise entitled to the interposition of the court." ... "[E]quity will grant relief on the ground of mistake, not only when the mistake is expressly proved, but also when it is implied from the nature of the transaction." *Taylor v. Godfrey*, 62 W.Va. 677, 684–685, 59 S.E. 631, 634 (1907).

I agree with the California court in *MacFarlane v. Peters*, 103 Cal.App.3d 627, 163 Cal.Rptr. 655, 657 (1980), that "[w]hile sitting in its equitable capacity, a court may avail itself of powers broad, flexible and capable of being expanded to deal with novel cases and conditions .... While the facts in this case are without reported precedent, such lack is no deterrent to equitable relief." (Citations omitted.) Lack of precedent does not warrant denial of justice. Our state courts have equitable power to fashion just remedies.

## E. A statute.

In its regular 1982 session, the West Virginia Legislature enacted W.Va.Code, 22–4–1[L] [27] (1982 Acts of Legislature, ch. 105).[28] It thereby recognized the inequities of retaining the terms of these leases that predated anyone's understanding of the value of natural gas. It also acknowledged its police power to prevent overt oppression.[29]

---

acceptance or by determinations that the clause is contrary to public policy or to the dominant purpose of the contract."

**27.** The subsection of W.Va.Code, 22–4–1 to which we refer is a lower case *l.* Because the typeface for the letter l and the number 1 are similar, we have substituted a capital *L* to aid the reader.

**28.** The McGinnises did not cite this legislative enactment in their complaint or brief. Its recency may make it unavailable to them.

**29.** Pennsylvania has also solved this problem by legislation. In 1979, its legislature enacted 58 Pa.Stat. § 33 and § 34.

The title to the Act sufficiently explains its contents, and is quoted here in full:

AN ACT to amend article four, chapter twenty-two of the code of West Virginia, one thousand nine hundred thirty-one, as amended, by adding thereto a new section, designated section one-[L], relating to the issuance of permits for the drilling, redrilling, deepening, fracturing, stimulating, pressuring, converting, combining or physically changing of oil and gas wells; *prohibiting the issuance of such permits where royalties are based upon annual flat well royalty systems or any similar provisions* for compensation which are less than one[-]eighth of the value or volume of the production of the oil and gas of such wells; legislative findings and declarations with respect thereto; requiring the payment of one-eighth royalty upon the production of such oil and gas; requiring that all leases or other contractual agreements, by which the right to extract, produce or market oil or gas is claimed, be filed with all permit applications, or in the alternative, requiring certain filings to identify the parties and property involved and describe the royalty agreements and place of recordation; providing for the filing of certain affidavits when leases provide for less than one-eighth royalty; granting a cause of action to enforce provisions of this section; and providing for exceptions to and the enforcement of the provisions of said section. (Emphasis supplied.)

## CONCLUSION

The McGinnises are entitled to a hearing on the merits of their claim in circuit court,

"§ 33. Guarantee of minimum royalties
"A lease or other such agreement conveying the right to remove or recover oil, natural gas or gas of any other designation from lessor to lessee shall not be valid if such lease does not guarantee the lessor at least one-eighth royalty of all oil, natural gas or gas of other designations removed or recovered from the subject real property."
"§ 34. Escalation of royalties
"An oil, natural gas or other designation gas well or oil, natural gas or other designation gas

but upon much more equitable bases than the majority seems to allow.

lease which does not provide a one-eighth metered royalty shall be subject to such an escalation when its original state is altered by new drilling, deeper drilling, redrilling, artificial well stimulation, hydraulic fracturing or any other procedure for increased production. A lease shall not be affected when the well is altered through routine maintenance or cleaning."